THE HONORABLE, THE ASSEMBLY
By Assembly Resolution 14 you have asked my opinion as to the legal effect of 1971 Assembly Bill 583 relating to relocation payments in eminent domain proceedings, and also whether enactment of this bill would place Wisconsin "in compliance with" the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, P.L. 91-646, 84 Stat. 1894 (hereafter referred to as "the Federal Act"). Since the passage of Assembly Resolution 14, Assembly Bill 583 has, with certain *Page 50 
amendments, been enacted into law as ch. 103, Laws of 1971. In responding to Assembly Resolution 14, I will relate my discussion to ch. 103, Laws of 1971, rather than to Assembly Bill 583.
In answer to your first question as to the legal effect of ch. 103, this chapter liberalizes the provisions of existing sec.32.19, Stats. Chapter 103 does not alter the basic structure or philosophy of sec. 32.19, Stats., but rather provides for numerous technical changes, the net effect of which are to extend eminent domain relocation payments in greater dollar amounts to more persons under more circumstances. Chapter 103 also provides greater procedural rights to persons affected by condemnation than are provided in existing sec. 32.19, Stats.
Chapter 103 provides the following increased benefits for persons affected by condemnation: the dollar amounts payable to such persons and businesses are increased substantially; more payment options are available to displaced persons and businesses; the eligibility standards for such increased payments are lowered, making more persons affected by condemnation eligible to receive the benefits of sec. 32.19, Stats.; more optional payment plans are available to displaced persons and businesses; and the procedural options available to displaced persons to contest the non-extension of relocation benefits or the amount of these benefits are increased.
In certain respects, however, ch. 103 dilutes or diminishes the benefits available under sec. 32.19, Stats. In connection with replacement housing, the requirement of sec. 32.19 (3) (b) 3a, Stats., that such housing be "adequate to accommodate the displaced owner" has been removed by ch. 103; the requirement that a displaced owner purchase and occupy his replacement housing within one year subsequent to the date on which he moves from the acquired dwelling previously applied only to replacement housing payments under sec. 32.19 (3) (b) 3a, Stats., but, under the terms of ch. 103, this limitation also applies to the reimbursement of refinancing costs. This limitation, however, has been liberalized by ch. 103 to include a period either one year after the date from which the displaced person moves from the acquired dwelling or the date on which he receives payment from the condemnor, whichever is later *Page 51 
Finally, ch. 103 contains language designed to insure that its relocation benefits are, in fact, extended to eligible persons displaced by any condemnation; that the condemnor partakes as fully as is legally possible of the available federal relocation payments and services under the Federal Act; that the Department of Industry, Labor and Human Relations and the Department of Local Affairs and Development have the authority to obtain court orders forcing compliance with sec. 32.19 through 32.27, Stats., in all condemnations; and that adequate relocation payment plans and relocation assistance service plans (sec. 32.25 (1), Stats.) are submitted in all condemnation proceedings, whether or not federal assistance is provided in the proceedings.
You have also asked whether enactment of ch. 103 would place the state "in compliance with" the Federal Act. In answering this question, I will refer to the Wisconsin Statutes relating to relocation payments and assistance, as amended by ch. 103, Laws of 1971, as the State Act.
Section 221 of the Federal Act, provides that the Act shall take effect on the date of its enactment. It is indicated on the Act that it was "approved" on January 2, 1971, which presumably may be considered as its date of enactment. It is stated further in sec. 221 (b) of the Federal Act that until July 1, 1972, those provisions of the Act concerning the applicability of the Act to the states shall themselves apply to the states "only to the extent that such State is able under its laws to comply with such sections." After July 1, 1972, however, the sections which apply the Act to the states shall be "completely applicable to all States."
Section 210 of the Federal Act provides that the head of a federal agency shall not approve any grant to a state agency under which federal financial assistance will be available to pay all or part of the cost of any program "which will result in the displacement of any person" unless he receives "satisfactory assurances from such State agency" that "fair and reasonable relocation payments and assistance shall be provided to or for displaced persons" in accordance with the provisions of the Federal Act relating to (1) moving and related expenses (sec. 202); (2) replacement housing for homeowners (sec. 203); (3) *Page 52 
replacement housing for tenants and certain others (sec. 204) and that replacement assistance advisory services (sec. 205) "shall be provided to such displaced persons."
Section 305 of the Federal Act provides further that the head of a federal agency shall not approve any federally assisted state program "which will result in the acquisition of real property" unless he receives "satisfactory assurances from such State agency" (sec. 305 (2)) that property owners will be paid or reimbursed for necessary expenses incidental to the transfer of title to the condemnor (sec. 303) and for necessary litigation expenses (sec. 304). Section 305 (1) provides similarly that the head of the federal agency assisting a state agency in a federally assisted program involving the acquisition of real property must receive satisfactory assurances from the state agency that, in acquiring such real property, the state agency will be guided "to the greatest extent practicable under State law" by the Federal Act's uniform policy of real property acquisition practices and its policies in regard to the acquisition of buildings, structures and improvements.
The Wisconsin real property acquisition and condemnation procedures differ from those policies and procedures set forth in the Federal Act. However, I will not discuss these differences in this opinion in view of the fact that the Federal Act does not, in my opinion, require any changes in state condemnation procedures, in view of the language in the Federal Act that such procedures must conform to the Federal Act only "to the greatest extent practicable." In this opinion, I will discuss whether, under ch. 103, Laws of 1971, and other applicable state law, the state is "in compliance with" those provisions of the Federal Act that will be "completely applicable" to Wisconsin after July 1, 1972, as discussed previously. I will not consider those instances where the State Act would provide a payment not allowable under the Federal Act. While I will point out some differences between ch. 103, Laws of 1971, and the Federal Act, these differences should not be construed as resulting in noncompliance with the Federal Act unless specifically so stated.
One area in which the Wisconsin Act differs from the Federal Act is in the way in which certain words and phrases used throughout both Acts are defined. The definition in the Federal *Page 53 
Act of "a person" is simply "any individual, partnership, corporation, or association" (sec. 101 (5)). The State Act defines "person" in sec. 32.19 (2)(a), Stats., as "any individual, partnership, corporation or association which owns a business concern; or any owner, part owner, tenant or sharecropper operating a farm; or an individual who is the head of a family; or an individual not a member of a family." A "family" is defined as "two or more individuals living together in the same dwelling unit who are related to each other by blood, marriage, adoption or legal guardianship."
The Federal Act defines "displaced person" in sec. 101 (6) as any person who moves from, or moves his personal property from, real property as a result of the whole or partial public acquisition of such real property or as a result of "the written order of the acquiring agency to vacate real property." The State Act, in sec. 32.19 (2) (c), Stats., defines such "displaced person" as one who moves similarly as a result of the acquisition of such real property "or subsequent to the issuance of a jurisdictional offer under this chapter."
The Federal Act in sec. 101 (9) defines "mortgage" as "such classes of liens as are commonly given to secure advances on, or the unpaid purchase price of, real property, under the laws of the state in which the real property is located, together with the credit instruments, if any, secured thereby." The State Act contains no definition of mortgage, although other sections of the state statutes define that term for the purposes of the sections in question. For example, "mortgage" is defined in the sections relating to housing authorities for the elderly (sec. 66.395 (3), Stats.), housing authorities (sec. 66.40 (3), Stats.) and urban redevelopment (sec. 66.405 (3), Stats.).
In defining "farm operation" the Federal Act in sec. 101 (a) includes timber and also refers to the production of agricultural products for sale or home use. The Wisconsin definition of farm operation in sec. 32.19 (2) (e), Stats., does not include timber and refers to the production of agricultural products for saleand home use. *Page 54 
"Business" is defined nearly identically in the two Acts, except that the federal definition in sec. 101 (7) (A) of the Federal Act includes any activity conducted primarily for the purchase, sale, lease and rental of personal and real property, while the State Act, in sec. 32.19 (2) (d), Stats., substitutes "or" where the Federal Act utilizes "and."
In connection with a second optional means of reimbursing a business or farm operation for their moving expenses, both Acts define "average annual net earnings." The Federal Act in sec. 202 (c) defines them as one-half of any net earnings of the business or farm operation, before income taxes, during the two taxable years immediately preceding the taxable year in which the business or farm operation moves from the acquired real property, or during such other period as the condemnor determines to be "more equitable" for establishing such earnings. The Federal Act then states that "average annual net earnings" includes any compensation paid by the business or farm operation to the owner or his family "during such period." The state definition, found in sec. 32.19 (3) (b) 2b, Stats., is similar to the Federal Act, except that the term includes any compensation paid by the business or farm operation to the owner or his family "during such two-year period," thereby eliminating any earnings by the owner or his family during any period (other than the two-year period) which the condemnor might find was "more equitable" for establishing such earnings.
Looking now at those provisions of the Federal and State Acts pertaining to moving and related expenses, sec. 202 (a), of the Federal Act, provides for the payment of such expenses "whenever the acquisition of real property for a program or project undertaken . . . will result in the displacement of any person . . . (the condemnor) shall make a payment to any displaced person, upon application as approved by (the condemnor)." Section 32.19 (3), Stats., provides for moving and related expenses under the following circumstances:
"(3) Relocation Payments. Any condemnor which proceeds with the acquisition of real and personal property for purposes of any project for which the power of condemnation under this chapter may be exercised, shall make fair and reasonable relocation payments to displaced persons, business concerns and *Page 55 
farm operations under this section. The following items shall be compensable in eminent domain proceedings where shown to exist. . . . The condemnor shall compensate a displaced person for . . ."
The provisions of the sections relating to the payment of actual, reasonable moving expenses are similar except that the Federal Act allows expenses for an individual in moving himself, his family, business, farm operation "or other personal property." The State Act in sec. 32.19 (3) (a), Stats., provides for such expenses "including personal property." Also, the Federal Act in sec. 202 (a) (2) provides for actual direct losses of tangible personal property as a result of moving in an amount not to exceed the reasonable expenses that would have been required to relocate such property "as determined by the head of the (condemning) agency." The State Act does not contain the quoted phrase. However, by virtue of the definition of "property" contained in sec. 32.01 (2), Stats., the state, in essence, will be in compliance with the provisions of the Federal Act.
Both Acts contain provisions allowing displaced persons certain options as to moving expenses. Section 202 (b) of the Federal Act provides such optional payments for any displaced person eligible for payments under the section relating to the payment of actual, reasonable moving expenses and who "is displaced from a dwelling" and who elects to accept the payments authorized by this subsection in lieu of the payments authorized by the section relating to the payment of actual, reasonable moving expenses. The State Act in sec. 32.19 (3) (b) (1) Stats., provides such optional moving expense allowance to any displaced person who "moves from a dwelling" and who elects to accept the payments authorized by this paragraph in lieu of the payments authorized in the paragraph relating to the payment of actual, reasonable moving expenses.
Both Acts contain provisions for a second optional moving payment to persons displaced from their businesses or farm operations by the condemning agency. Section 202 (c) provides such second optional payments to "any displaced person eligible for payments under subsec. (a) of this section (relating to actual, reasonable moving expenses) who is displaced from his place of business or from his farm operation and who elects to accept the *Page 56 
payment authorized by this subsection in lieu of the payment authorized by (the sections relating to the payment of actual, reasonable moving expenses.)" The State Act in sec. 32.19 (3) (b) (2), Stats., provides such second optional moving expense payment to any displaced person who, "moves or discontinues" his business or farm operation and who elects to accept payment authorized under this paragraph in lieu of the payment authorized under the sections relating to the payment of actual, reasonable moving expenses.
Both Acts contain provisions relating to replacement housing for homeowners. Section 203 (a) (1) of the Federal Act provides for such payments "to any displaced person who is displaced from a dwelling actually owned and occupied by such displaced person. . . ." The State Act in sec. 32.19 (4) (a), Stats., provides for such payments "to the owner of real property acquired for a project which property is improved by dwelling actually owned and occupied by the owner. . . ." Section 32.19
(4) (a), Stats., of the State Act provides further that a non-profit corporation organized under ch. 181, Stats., may be considered a displaced owner for the purpose of these payments for replacement housing, if it is otherwise eligible for such payments.
The replacement housing payment allowed to homeowners by sec. 203 (a) (1) of the Federal Act, provides for a payment which when added to the acquisition "cost" of the dwelling acquired equals the reasonable cost of a comparable replacement dwelling. The State Act in sec. 32.19 (4) (1), Stats., provides for such a payment which when added to the acquisition "payment" equals the reasonable cost of a comparable replacement dwelling.
In sec. 203 (a) (1) (A) of the Federal Act, the comparable replacement dwelling which may be purchased by the displaced homeowner in order to qualify for repayment under this provision must be a decent, safe and sanitary dwelling "adequate to accommodate such displaced person" reasonably accessible to public services and places of employment and available on the private market. All of the determinations as to the conditions of the comparable replacement dwelling are to be made in accordance with standards established by the head of the federal agency making the payment. The State Act in sec. 32.19 (4) (1), Stats., differs somewhat from the federal provisions. Section 32.19 *Page 57 
(4) (a) 1, Stats., of the State Act does not contain the requirement found in the Federal Act that the replacement dwelling must be "adequate to accommodate such displaced person." Furthermore, while sec. 32.19 (4) (a) 1, Stats., of the State Act requires the comparable replacement dwelling to be decent, safe and sanitary, it is only this condition which is to be determined by the Department of Local Affairs and Development and the Department of Industry, Labor and Human Relations jointly. The additional conditions found in the Federal Act that the replacement dwelling must be reasonably accessible to public services and places of employment and available on the private market are not, according to the State Act, specifically determinable by these two state agencies.
The Federal Act in sec. 203 (a) (1) (B), provides for a payment for the increased interest costs which the displaced owner may incur in purchasing a comparable replacement dwelling. The Federal Act provides that this payment shall be in the amount, if any, which will compensate such displaced person for any increased interest costs which such person is required to pay for financing the acquisition of any such comparable replacement dwelling. The State Act in sec. 32.19 (4) (a) 2, Stats., merely provides for the payment of "all expenses incurred by the owner to finance the purchase of another property substantially similar to the property taken," including the "increased interest cost [sic.] above that provided in the former financing."
The Federal Act sets forth certain conditions for these replacement housing payments to homeowners. The Act in sec. 203 (a) (1) (B) states that these payments shall be made only if "the dwelling acquired by the Federal agency" was encumbered by a bona fide mortgage "which was a valid lien on such dwelling for not less than 180 days prior to the initiation of negotiations for the acquisition of such dwelling." The State Act in sec. 32.19
(4) (a) 2, Stats., merely provides for such payments if "at the time of the taking the land condemned" was subject to a bona fide mortgage or was held under a vendee's interest in a bona fide land contract. The State Act provides further that such mortgage or land contract must have been executed in good faith not less than 180 days prior to the initiation of the attempt to purchase the property. *Page 58 
Section 203 (a) (1) (B) of the Federal Act specifies that such payments for refinancing costs "shall be equal to the excess in the aggregate interest and other debt service costs" in the replacement refinancing. Section 32.19 (4) (a) 2, Stats., of the State Act provides for the payment of such "increased interest costs," provided that the computation of such costs shall be "based upon and limited to" only certain portions of the new financing. The Federal Act allows for the reimbursement of only the excess interest and debt service costs which are related to the present value of the amount of the principal of the replacement mortgage which is equal to the unpaid balance of the mortgage on the acquired dwelling over the remainder term of the former mortgage. Section 32.19 (4) (a) 2a and b, Stats., of the State Act allows for payment of a principal amount of indebtedness "not to exceed the unpaid debt at the date of taking" for a term "not to exceed the remaining term of the original mortgage or land contract at the date of taking." Section 203 (a) (1) (B) of the Federal Act contains no limitation upon the reimbursable interest rate which the displaced person may incur on the replacement mortgage, noting that reimbursement shall be made "for any increased interest costs which such (displaced) person is required to pay. . . ." Section 32.19 (4) (a) 2c, Stats., of the State Act limits the reimbursable interest rate to a rate "not to exceed the prevailing rate charged by mortgage lending institutions doing business in the vicinity." The discount rate specified in sec. 203 (a) (1) of the Federal Act shall be the prevailing interest rate paid on savings deposits by commercial banks "in the general area in which the replacement dwelling is located." Section 32.19 (4) (a) 2d, Stats., of the State Act provides for a discount rate "computed at" the prevailing interest rate paid on savings deposits by commercial banks doing business "in the vicinity."
The Federal Act in sec. 203 (a) (1) (C) also provides for the payment of reasonable expenses incurred by such displaced person "for evidence of title, recording fees, and other closing costs incident to the purchase of the replacement dwelling, but not including prepaid expenses." Section 32.19 (4) (a) 2, Stats., of the State Act provides for the payment of "all expenses incurred by the owner to finance the purchase of another property substantially similar to the property taken. . ." including reasonable incidental fees, commissions, discounts, surveying costs *Page 59 
and title evidence costs necessary to refinance the balance of the debt at the time of taking, if actually incurred. Furthermore, sec. 32.19 (4) (c), Stats., of the State Act provides for the reimbursement to the owner of acquired real property for all reasonable and necessary expenses incurred for recording fees, transfer taxes and similar expenses incidental to conveying his property to the condemnor, including penalty costs for prepayment of mortgages meeting certain standards.
Finally, both Acts contain a blanket statement that their respective provisions relating to replacement housing for homeowners are to apply only to those displaced owners who purchase a replacement dwelling within a one-year period. One of the points in time from which this one-year period in sec. 203 (c) (2) of the Federal Act can be measured is the date on which the displaced owner receives from the condemnor "final payment of all costs of the acquired dwelling." Section 32.19 (4) (a) 3, Stats., of the State Act alternately begins measuring the one-year period within which a displaced owner can purchase a replacement dwelling and be eligible for replacement housing payments from the date on which such displaced owner "receives payment" from the condemnor.
Section 203 (b) of the Federal Act, provides as follows:
"(b) The head of any Federal agency may, upon application by a mortgagee, insure any mortgage (including advances during construction) on a comparable replacement dwelling executed by a displaced person assisted under this section, which mortgage is eligible for insurance under any Federal law administered by such agency notwithstanding any requirements under such law relating to age, physical condition, or other personal characteristics of eligible mortgagors, and may make commitments for the insurance of such mortgage prior to the date of execution of the mortgage."
By virtue of secs. 221 (b) and 210 of the Federal Act, it would appear that the provisions of the above-quoted section might be applicable to Wisconsin. However, the language of the quoted section creates serious doubt whether it was the intent of Congress to make it applicable to the states. Wisconsin has no similar statutory provision. Therefore, if the quoted section is applicable *Page 60 
to the states, in a strict sense, Wisconsin would not be in compliance. However, I might add that if a mortgagee requires mortgage insurance and the mortgagor obtains it, the state may reimburse the mortgagor the cost thereof under sec. 32.19 (4) 2, Stats.
Both the Federal and State Acts contain provisions relating to payment for replacement housing for tenants and certain others who are displaced by condemnation. The Federal Act, in sec. 204, allows such payment "to or for any displaced person" meeting certain standards, while the State Act in sec. 32.19 (4) (b), Stats., allows such payments "to any individual or family displaced from any dwelling" and also to nonprofit corporations organized under ch. 181, Stats. Secondly, the Federal Act, in sec. 204 (1), provides that the dwelling into which the displaced person may move in order to be eligible for these payments must meet certain standards set forth in the Act. The State Act, on the other hand, expressly states in sec. 32.19 (4) (b) 1 and 2, Stats., that the standards for the dwelling to which the displaced tenant may move in order to eligible for these replacement housing payments are to be established by the Department of Local Affairs and Development and the Department of Industry, Labor and Human Relations jointly. Also, the Federal Act requires in sec. 204 (1) that the replacement unit must be "reasonably accessible to his (the displaced tenant's) place of employment," while the State Act merely requires (sec. 32.19 (4) (b) 1, Stats., that the replacement dwelling be in an area not generally less desirable in regard to "places of employment."
Both Acts also contain provisions enabling displaced tenants to receive payments for the purpose of making down payments on replacement dwellings. The Federal Act sets forth in sec. 204 (2) the standards which the replacement dwelling must meet in order that the displaced person will be eligible to be reimbursed for his down payment. In setting forth these standards, the Federal Act in sec. 204 (2) contains no standards in relation to places of employment or to the displaced person's place of employment. The State Act in sec. 32.19 (4) (b) 2, Stats., provides that such replacement dwellings must be in areas not generally less desirable in regard to "places of employment." Finally, sec. 204 (2) of the Federal Act relating to replacement housing *Page 61 
reimbursements for tenants allows for the repayment of reasonable incidental expenses incurred by the displaced tenant, including reasonable expenses for evidence of title, recording fees and other closing costs incidental to the purchase of the replacement dwelling, but not including prepaid expenses. Section 32.19 (4) (b) 2, Stats., of the State Act also provides for the repayment of incidental expenses, but the state provision includes only reasonable incidental fees, commissions, discounts, surveying costs and title evidence costs necessary to refinance the balance of the debt at the time of taking, if actually incurred.
Both Acts require that the condemnor make relocation assistance advisory services available in certain instances. The Federal Act in sec. 205 (a) provides that the condemnor "shall provide a relocation assistance advisory program for displaced persons" and each relocation advisory assistance program shall (sec. 205 (c)) include "such measures, facilities, or services as may be necessary or appropriate" in order to meet the objectives set forth in the remainder of the section. The State Act in sec.32.25 (1), Stats., provides that the condemnor must file in writing "a relocation payment plan and relocation assistance service plan and (have) . . . both such plans approved in writing by the Department of Local Affairs and Development." Section32.25 (3), Stats., provides that the relocation assistance service plan shall contain evidence that the condemnor has taken reasonable and appropriate steps to achieve certain enumerated objectives.
The Federal Act in sec. 205 (a) provides that the condemnor may determine that any person occupying property immediately adjacent to the real property acquired is caused substantial economic injury because of the acquisition, in which event he may offer such person relocation advisory services. No comparable provision is contained in the State Act. Thus, in a very strict sense, Wisconsin would not be in compliance with this provision of the Federal Act. However, I note that this provision is not a mandatory one. Further, Wisconsin will have established its relocation assistance program and there is nothing in Wisconsin's law that would prohibit the acquiring agency from administratively making relocation assistance available to persons affected by the taking within the purview of sec. 205 (a) of the Federal Act. *Page 62 
Section 205 (b) of the Federal Act provides that any federal agencies which are administering programs which may be of assistance to displaced persons covered by the provisions of the Federal Act shall cooperate "to the maximum extent feasible" with the condemning agency causing the displacement "to assure such displaced persons receive the maximum assistance to them." The State Act has no directly comparable provision, although sec.20.901 (1), Stats., does provide that, as a general matter, "the state agencies shall co-operate in the performance and execution of state work. . . ."
Certain criteria are set forth in both Acts regarding the nature of the relocation assistance advisory programs. In sec. 205 (c) (1) of the Federal Act it is required that the program contain a determination of the need, if any, of displaced persons, for relocation assistance. No direct comparable provision exists in the State Act, although sec. 32.25 (a), Stats., requires the condemnor to determine the cost of any relocation payments and services or the methods that are going to be used to determine such costs. Assumedly, it would be necessary to determine the need prior to determining the costs. Section32.25 (3) (g), Stats., of the State Act also requires the condemnor to take reasonable and appropriate steps to determine the approximate number of persons, farms or businesses that will be displaced by the project.
Section 205 (c) (3) of the Federal Act requires the condemnor to assure that, within a reasonable period of time prior to displacement, there will be available in areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families and individuals displaced, decent, safe and sanitary dwellings as defined by the condemnor. Section 32.25 (3) (h), Stats., of the State Act provides that the condemnor's relocation assistance service plan must contain evidence that the condemnor has taken reasonable and appropriate steps to assure that "to the extent that may reasonably be accomplished" the federally described standards are met; and that this housing must meet the above-described federal standards "so far as practicable." These replacement dwellings must meet the standards established jointly by the Department of Local Affairs and Development and the Department of Industry, Labor and Human Relations for decent, *Page 63 
safe and sanitary dwellings. Section 205 (c) (3) of the Federal Act requires that this replacement housing must be "available to such displaced persons who require such dwellings . . . (except that) the condemnor may prescribe by regulation situations when such assurances may be waived." The State Act contains no similar provisions.
The Federal Act in sec. 205 (c) (4) requires that the condemnor must assist a displaced person displaced "from his business or farm operation" in obtaining and becoming established in a suitable "replacement" location. The parallel state provision, found in sec. 32.25 (3) (b), Stats., requires the condemnor to take reasonable and appropriate steps to assist "owners" of displaced business and farm operations, in obtaining and becoming established in suitable business locations or "replacement" farms. The Federal Act in sec. 205 (c) (6) provides that the condemnor must "provide other advisory services" to displaced persons in order to minimize hardships to such persons in adjusting to relocation. The State Act in sec. 32.25 (3) (e), merely requires the condemnor to take reasonable and appropriate steps to "assist" displaced persons in this respect.
In sec. 205 (d) the heads of federal agencies "shall" coordinate relocation activities with other governmental actions in the community or nearby areas which may affect the carrying out of relocation assistance "programs." The State Act in sec.32.25 (3) (f), Stats., requires the condemnor to take reasonable and appropriate steps to "secure, to the greatest extent practicable," such coordination of other programs which may affect "the relocation program."
Section 302 (a), provides, inter alia, that the acquiring agency acquire buildings, structures, or other improvements which the acquiring agency determines will be adversely affected by the public improvement project even though such buildings, structures, or other improvements are not located on the real property acquired for the project. Under Wisconsin law, a condemning authority may not condemn property in excess of that required for the public improvement project. While the Highway Commission does have the authority to acquire property in excess of that actually required for a project, this acquisition authority may be exercised only if the owner of the real estate *Page 64 
involved agrees. Excess acquisition cannot take place against the landowner's desire. Therefore, the state of Wisconsin cannot be in compliance with sec. 302 (a) insofar as it requires the acquisition of property located outside of the limits required for public purpose. However, this noncompliance may be negligible since, under Wisconsin law and practice, it is the landowner and not the state that determines whether excess acquisition will occur, except that the state is not legally compelled to acquire excess property and will not do so if the landowner's position or terms are considered by the state to be unreasonable.
Section 302 (b) of the Federal Act might be construed as requiring a separate payment of a portion of the just compensation to a tenant where the property being acquired is subject to a lease. (Under what circumstances this is required under the language of this section is unclear.) While I do not construe sec. 302 (b) of the Federal Act as requiring a separate payment, if it is determined that this section does require a separate payment to the tenant, Wisconsin law does not permit compliance. A long line of cases decided by our Supreme Court clearly establishes that, in eminent domain proceedings, the property involved be appraised as a whole and that just compensation be made to the owner or owners "in gross." Chapter 32, Stats., requires that the property being acquired be appraised as a whole and that all owners be named on the award of damages. Further, Wisconsin's statutes do not permit separate appeals to an award of damages, but requires all owners of interest in the real estate to join in an appeal from an award of damages made in eminent domain or be barred from further appeal. Finally, Wisconsin law directs that, if the separate owners of real estate cannot agree to a division of an award of damages, any party to an award may partition, pursuant to sec. 277.01, Stats., for a proper division of the award. Thus, division of an award of damages between different owners is not permissible under Wisconsin law. Therefore, Wisconsin is not in compliance with sec. 302 (b) of the Federal Act, if it does require separate payment. However, in my opinion, Wisconsin is in compliance since such tenant, as I construe the meaning of this section, would be included as one of the owners of the real estate and would be named on the award of damages and included as a payee on any check for payment of just compensation. *Page 65 
Both Acts provide that the condemnor shall pay certain expenses incidental to the transfer of title to it. The Federal Act in sec. 303 provides that these payments shall be made "as soon as practicable after the date of payment of the purchase price or the date of deposit in court of funds to satisfy the award of condemnation in a condemnation proceeding to acquire real property, whichever is earlier." The State Act in sec. 32.19 (4) (c), Stats., merely states that "condemnor shall reimburse" the owner of acquired real property for certain enumerated incidental expenses. The Federal Act in sec. 303 provides that the owner shall be reimbursed for certain enumerated expenses "he necessarily incurred" to the extent the condemnor "deems fair and reasonable." The State Act in sec. 32.19 (4) (c), Stats., merely provides that the owner shall be reimbursed for "all reasonable and necessary expenses incurred" for the enumerated reimbursable expense items.
Section 304 of the Federal Act provides for the repayment to condemnees of certain litigation expenses. This section provides payment to the owner of any right or title to or interest in real property being acquired of "such sum as will in the opinion of the court reimburse such owner for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of the condemnation proceedings. . . ." These expenses are only reimbursable in the event either that the final judgment is that the condemnor cannot acquire the real property by condemnation or if the proceeding is abandoned by the condemnor. These litigation expenses, when payable, are to be paid by the condemnor who was intending to acquire the property.
The only comparable provision in the State Act is found in sec.32.06 (9), Stats. Condemnation proceedings must be instituted under sec. 32.06, Stats., for all public purposes except those for streets, highways, storm or sanitary sewers, water courses, alleys, airports, cemeteries, municipal acquisition of utilities and acquisitions by cities of the first class (under ch. 275, Laws of 1931, as amended; the Kline Law). Section 32.06 (9), Stats., provides that, if a condemnor proceeding under sec. 32.06, Stats., desires to abandon the proceeding, it must so petition the circuit judge of the county where the property is located. The circuit *Page 66 
judge shall grant such a petition "upon such terms as he deems just, which terms may include reasonable expert witness fees incurred by condemnee for not to exceed 3 expert witnesses and a reasonable attorney's fee both as approved by the judge." No comparable provision is contained within sec. 32.05, Stats., the section which must be followed in all condemnation actions not properly brought under sec. 32.06, Stats. Wisconsin law contains no provision for the payment of any costs, other than statutory costs and disbursements (which would limit recovery of attorneys' fees to $100), to the condemnee in the event of a court determination that the acquisition is not necessary for the accomplishment of a public purpose. In this respect, the state is in noncompliance with the Federal Act. I might add parenthetically that such occurrence in Wisconsin is so rare as to be virtually nonexistent.
In conclusion, I have discussed in the preceding opinion the many variances between the Wisconsin Statutes, as amended by ch. 103, Laws of 1971, and P.L. 91-646, the Federal Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970.
In conclusion, it is my opinion that the Wisconsin statutes are "in compliance with" the Federal Act, except in those instances where I have specifically indicated otherwise.
Whether Wisconsin law permits compliance with sec. 217 of the Federal Act by contracting municipalities or agencies appears to be unclear, and I express no present opinion whether Wisconsin law allows compliance. Since the issue seems cloudy, it is my recommendation, in order to remove this issue from doubt, that legislation be enacted to direct compliance with sec. 217 of the Federal Act.
RWW:BS