CITY OF JANESVILLE,
Plaintiff-Respondent-Petitioner,

v.

CC MIDWEST, INC. a foreign corporation,
Defendant-Appellant.

Supreme Court

*No. 2004AP267. Oral argument October 11, 2006.
—Decided July 11, 2007.*

2007 WI 93

(Also reported in 734 N.W.2d 428.)

600

602

For the plaintiff-respondent-petitioner there were briefs by *Mark J. Steichen* and *Boardman, Suhr, Curry & Field LLP,* Madison, and oral argument by *Mark J. Steichen.*

For the defendant-appellant there were briefs by *Alan Marcuvitz, Andrea H. Roschke,* and *Michael Best & Friedrich LLP,* Milwaukee, and oral argument by *Alan Marcuvitz.*

An amicus curiae brief was filed by *James S. Thiel, Cari Anne Renlund,* and *Paul E. Nilsen,* Madison, on behalf of the Wisconsin Department of Transportation.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. This is a review of a decision of the court of appeals reversing the circuit court's judgment[1] granting the City of Janesville (the City) a writ of assistance to remove the defendant, CC Midwest, Inc. (CC Midwest), from property that the City previously acquired by exercising its power of eminent domain. The circuit court concluded that there were no issues of material fact and the City had met its statutory obligation to make available to CC Midwest a comparable replacement property/business as required by Wis. Stat. § 32.05(8)(b)-(c) and Wis. Stat. § 32.19(2)(c) (2003–04).[2] The circuit court also concluded that granting the City a writ of assistance did not deprive CC Midwest of any constitutional rights. The court of appeals reversed. It agreed that the question presented was one of law, but it held that *"[b]ecause it is undisputed* that none of the properties

---

[1] Judge John W. Roethe, Circuit Court for Rock County, presided.

[2] All subsequent references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

603

the City identified met [the statutory definition of comparable replacement property set out in § 32.19(2)(c)], the City was not entitled to a writ of assistance." *City of Janesville v. CC Midwest, Inc.*, 2006 WI App 21, ¶ 32, 289 Wis. 2d 453, 710 N.W.2d 713 (emphasis added). Accordingly, in a published opinion, it reversed the circuit court judgment. *Id.*

¶ 2. We conclude that in satisfying its statutory obligation to make available a comparable replacement property, pursuant to Wis. Stat. § 32.05(8)(b)-(c), the City must identify one or more properties that meet the parameters of Wis. Stat. § 32.19(2)(c)[3] to serve as a comparable replacement business. Because we conclude that the City has done so and has made no contrary concession in this regard,[4] we reverse the decision of the court of appeals.

## I. BACKGROUND

¶ 3. On February 7, 2003, the City acquired the ownership of a property at 1627 South Jackson Street in the City of Janesville, Wisconsin (the Property), through condemnation proceedings. The condemnation

---

[3] There are relocation payments not at issue in this case that are required by Wis. Stat. § 32.19. However, monetary relief is not requested in this lawsuit. As counsel for CC Midwest stated at oral argument, if CC Midwest prevails in this lawsuit, it will seek damages in another action.

[4] At oral argument before this court, the City explained that it had not represented to the court of appeals that it had failed to identify a statutorily sufficient comparable replacement business, but that the court of appeals had misunderstood its position. The City's brief to the court of appeals is consistent with the City's position before us. Therefore, it appears there was a misunderstanding at the court of appeals in regard to the City's position.

was part of a transportation project involving reconstruction of a street and construction of a railroad bridge, underpass, and drive. The Property, consisting of approximately nine acres, was leased and occupied by CC Midwest. Only 3.2 acres of the Property actually were used by CC Midwest. CC Midwest is a wholly owned subsidiary of CenTra, Inc. (CenTra), and another wholly owned subsidiary of CenTra, Crown Enterprises, Inc., owned the Property that CC Midwest rented before the City acquired ownership of it.

¶ 4. CC Midwest operated a "less than truck-load business" on the Property, wherein customers sent and received freight in quantities less than a full semi-trailer load. CC Midwest's trucks picked up freight and returned to the Property where the freight was unloaded. Other trucks were later reloaded to complete full truckloads of freight. They delivered their loads to other terminals within CenTra's network, which covers 38 states. The building on the Property included 20 docks, 16 of which were arranged in a "cross-docking" configuration that allowed the trucks that were being unloaded to be directly across the terminal floor from the doors of the trucks that received the freight.

¶ 5. CC Midwest was notified of the City's plans to acquire ownership of the Property in November 2001. In October 2002, the City advised CC Midwest by letter that it would need to relocate and would receive a 90–day notice of when it had to move. The City explained that CC Midwest would be eligible for specified relocation assistance in accordance with Wisconsin's relocation assistance law. The letter also listed seven properties that CC Midwest might "wish to consider" for relocation, including four properties identified by the City as "com-

parable replacement businesses."[5] On February 6, 2003, the City notified CC Midwest that it had until May 8, 2003, to vacate and that CC Midwest was entitled to 30 days of rent-free occupancy commencing February 15, 2003. The City also specified rent for any other period that CC Midwest occupied the premises.

¶ 6. On February 24, 2003, the City notified CC Midwest of eight additional potential relocation sites.[6] In March 2003, CC Midwest informed the City that none of the identified sites was a comparable replacement business because none satisfied its interpretation of the statutory criteria. For example, CC Midwest rejected some properties because either the land or the building was too small; the buildings, in their present form, were not suitable for CC Midwest's operations; the site was too far away from the General Motors

---

[5] The properties identified included five properties in Janesville with buildings on them: 3913 Whitney Street, 2727 Venture Drive, 2535 Beloit Avenue, 401 East Conde Street, and 1700 East Delavan Drive. Because CC Midwest expressed an interest in constructing a facility, three parcels of vacant land in Janesville were also identified: a parcel next to 2535 Beloit Avenue, a parcel on Conde Street, and a parcel on Venture Drive. The City stated that the 3913 Whitney Street property was the selected comparable for CC Midwest's present business. The cost of the Whitney Street property was represented to be $840,000, with a lease rate to be determined.

[6] The suggested relocation sites included five trucking facilities for sale in Waukesha, Sheboygan, Wausau, and Neenah, Wisconsin, and Rockford, Illinois; two areas of land available in the Beloit Industrial Park and the Gateway Business Park (Beloit); and a 15–acre site on the Union Pacific Railroad in Sharon, Wisconsin. The materials submitted to the circuit court show that the City identified a total of 20 properties during the period in which it negotiated with CC Midwest.

plant; or the site consisted of only vacant land.[7] The City's position was that at least three of the sites were comparable replacement businesses under its interpretation of Wis. Stat. § 32.19(2)(c).

¶ 7. On April 14, 2003, the City advised CC Midwest that it must physically vacate the premises by May 16, 2003. CC Midwest did not vacate by May 16, and the parties entered an occupancy agreement whereby CC Midwest could occupy the Property while the City sought a writ of assistance requiring CC Midwest to vacate. Under the agreement, CC Midwest surrendered a portion of the Property then owned by the City for the City's immediate construction needs. The City agreed to

---

[7] CC Midwest stated that the property at 3913 Whitney Street, a vacant cross-docking trucking facility which the City had identified as the selected comparable for CC Midwest's business, was too small of a site at two acres and was located on the opposite side of town. Because all of the properties the City identified required remodeling or new construction, CC Midwest rejected each one. The following list explains why some of the properties were rejected:

- 3040 West Wisconsin and 1700 East Delavan Drive, Janesville, were warehouses presently not suitable to cross-dock trucking operations.

- 2535 Beloit Avenue, Janesville, was vacant land with a manufacturing building that might become available. However, the owner advised CC Midwest the land was not for sale.

- The site at 2701 Beloit Avenue, Janesville, was vacant land and CC Midwest was advised it was not for sale.

- The trucking facility in Waukesha was in a Milwaukee suburb and priced similar to the City's value of the property from which CC Midwest had operated its business, but it was comprised of a smaller building on less than one third the size of the land.

- Trucking terminals in Sheboygan, Wausau, and Neenah, Wisconsin, and Rockford, Illinois, and the vacant land in Beloit and Sharon, Wisconsin, were all too far from Janesville.

continue to lease the Property to CC Midwest through September 30, 2003. However, when CC Midwest had not vacated the Property by October 1, 2003, two years after the City had first notified CC Midwest that it would be required to move its business, the City filed this action.

¶ 8. The City sought a declaration that it had complied with Wis. Stat. ch. 32 and was entitled to a writ of assistance directing CC Midwest to vacate the Property. CC Midwest opposed the writ on the basis that the City had not "made available" a "comparable replacement property" as required by Wis. Stat. § 32.05(8)(b)-(c). The circuit court treated the City's motion as a motion for summary judgment. The parties filed briefs and affidavits on whether the City met its obligation to make available a comparable replacement property. In addition, CC Midwest argued that granting the writ would constitute a taking without just compensation in violation of the Fifth Amendment of the United States Constitution and Article I, Section 13 of the Wisconsin Constitution. The circuit court rejected the takings argument, concluded there were no issues of material fact, determined the City had met its obligation under § 32.05(8)(b)-(c) and issued a judgment granting the City a writ of assistance.

¶ 9. CC Midwest appealed. The court of appeals certified a question in regard to the meaning of "comparable replacement business" in Wis. Stat. § 32.19(2)(c), which we declined to accept. The court of appeals then requested a second round of briefs from the parties and held oral argument.

¶ 10. CC Midwest contended, as it had in the circuit court, that the City was not entitled to a writ of assistance because it had not "made available" a "comparable replacement property" as required under Wis.

Stat. § 32.05(8)(b)-(c). CC Midwest also renewed its argument that the granting of the writ would constitute a taking of its property without just compensation. The City argued that the relocation statute required it to identify property that could be made comparable to a replacement business and to offer the payment identified in Wis. Stat. § 32.19(3) and (4m). It identified four Janesville facilities, but CC Midwest rejected them because each required renovation.[8] The court of appeals said the City conceded at oral argument that none of the identified properties met the statutory criteria for a comparable replacement business in § 32.19(2)(c).[9] *CC Midwest*, 289 Wis. 2d 453, ¶¶ 7, 32.

¶ 11. The court of appeals then concluded that under the plain language of the statutes and the judicial construction of "made available" from *Dotty Dumpling's Dowry, Ltd. v. Community Development Authority of Madison*, 2002 WI App 200, 257 Wis. 2d 377, 651 N.W.2d 1, "the City could not require CC Midwest to vacate the property the City had acquired without identifying a comparable replacement property meeting the definition of § 32.19(2)(c)." *CC Midwest*, 289 Wis. 2d 453, ¶ 32. The court of appeals also noted that CC Midwest said it had vacated the property and that the building it had occupied had been torn down. *Id.*, ¶ 32 n.10. The court of appeals did not address CC Midwest's argument that the circuit court erred in concluding that

---

[8] The Janesville facilities the City deemed most comparable to CC Midwest's business needs were 3913 Whitney Street, 1700 East Delavan Drive, 2727 Venture Drive and 2535 Beloit Avenue.

[9] Before us, the City asserts it made no such concession, and the City's brief filed with the court of appeals shows no concession.

the City had not violated CC Midwest's rights under Article I, Section 13 of the Wisconsin Constitution or the Fifth Amendment of the United States Constitution. *Id.*, ¶ 5 n.3.

¶ 12. The City petitioned for review, which we granted.

## II. DISCUSSION

### A. Standard of Review

■

¶ 13. We review a grant of summary judgment independently, applying the same methodology as the circuit court. *AKG Real Estate, LLC v. Kosterman*, 2006 WI 106, ¶ 14, 296 Wis. 2d 1, 717 N.W.2d 835 (citing *O'Neill v. Reemer*, 2003 WI 13, ¶ 8, 259 Wis. 2d 544, 657 N.W.2d 403); *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987).

■

¶ 14. In order to determine whether summary judgment is appropriate in this case, we interpret Wis. Stat. § 32.05(8)(b)-(c) and various provisions of Wis. Stat. § 32.19(2). The interpretation of a statute is a question of law that we review independently. *State v. Reed*, 2005 WI 53, ¶ 13, 280 Wis. 2d 68, 695 N.W.2d 315; *State v. Setagord*, 211 Wis. 2d 397, 405–06, 565 N.W.2d 506 (1997).

### B. Relocation Assistance[10]

¶ 15. The relocation assistance benefits to which property occupiers may be entitled as a result of emi-

---

[10] A plurality of the court, Justice Jon P. Wilcox, Justice N. Patrick Crooks and Justice Patience Drake Roggensack, join the discussion of constitutional issues set forth in ¶¶ 16–21, mak-

nent domain proceedings are set out in Wis. Stat. § 32.19(2), (3)[11] and (4m).[12] As we explain briefly below, these benefits are purely statutory and are not required in order to satisfy the constitutional mandates for just compensation to those whose property was taken for a public use under the United States Constitution or under the Wisconsin Constitution.[13]

---

ing that portion of the opinion a lead opinion rather than a majority opinion. A majority of the court join the remainder of the opinion.

[11] Wisconsin Stat. § 32.19(3)(a) provides in relevant part:

> Moving expenses; actual. The condemnor shall compensate a displaced person for the actual and reasonable expenses of moving the displaced person and his or her family, business or farm operation, . . . not to exceed $10,000, unless compensation for such expenses is included in the payment provided under sub. (4m).

[12] Wisconsin Stat. § 32.19(4m)(b) provides in relevant part:

> In addition to amounts otherwise authorized by this subchapter, the condemnor shall make a payment to any tenant displaced person who has owned and occupied the business operation . . . who actually rents or purchases a comparable replacement business . . . for the displaced business . . . within 2 years after the date the person vacates the acquired property. At the option of the tenant displaced person, such payment shall be either:
>
> 1. The amount, not to exceed $30,000, which is necessary to lease or rent a comparable replacement business . . . for a period of 4 years. . . .; or
>
> 2. If the tenant displaced person elects to purchase a comparable replacement business . . ., the amount determined under subd. 1 plus expenses under par. (a)3.

[13] The concurrence of Justice Bradley concludes that it is unnecessary to discuss why the claim of CC Midwest is not constitutionally based. Justice Bradley's concurrence, ¶ 65. However, before the court of appeals, CC Midwest argued its claim had a constitutional foundation; before us, the City briefed this issue; and as the dissent of Justice Prosser shows,

¶ 16. It is well settled law that the Fifth Amendment of the United States Constitution[14] and Article I, Section 13 of the Wisconsin Constitution[15] require the government to pay just compensation when private property is taken for public use. *United States v. Welch*, 217 U.S. 333, 339 (1910); *Sonday v. Dave Kobel Agency, Inc.*, 2006 WI 92, ¶ 22 n.5, 293 Wis. 2d 458, 718 N.W.2d 631. However, the United States Supreme Court has determined that consequential losses, including relocation expenses, are not part of just compensation that the government is required to pay to private property owners. *United States v. Petty Motor Co.*, 327 U.S. 372, 377–78 (1946) (concluding that "evidence of loss of profits, damage to good will, the expense of relocation and other such consequential losses are refused in federal condemnation proceedings"). The Court explained, "it has come to be recognized that just compensation is the value of the interest taken. This is not the value to the owner for his particular purposes or to the condemnor for some special use but a so-called 'market value.' " *Id.* at 377. Since the "market value" to which the owner is entitled "does not fluctuate with the needs of [the] condemnor or condemnee but with [the] gen-

there is a need to explain why relocation assistance benefits are a purely statutory claim. Justice Prosser's dissent.

[14] The Takings Clause in the Fifth Amendment of the United States Constitution states, "nor shall private property be taken for public use, without just compensation." The Takings Clause is made applicable to the States by the Fourteenth Amendment. *Kelo v. City of New London*, 545 U.S. 469, 472 n.1 (2005) (citing *Chi., Burlington & Quincy R.R. v. City of Chi.*, 166 U.S. 226 (1897)).

[15] Article I, Section 13 of the Wisconsin Constitution states, "[t]he property of no person shall be taken for public use without just compensation therefor."

eral demand for the property," the Court determined that relocation expenses and other consequential losses are not considered in just compensation. *Id.*

¶ 17. We have recognized that "much authority exists for the proposition that the constitution does not require compensation for consequential losses." *Luber v. Milwaukee County*, 47 Wis. 2d 271, 277, 177 N.W.2d 380 (1970). Contrary to this general proposition, in *Luber*, pursuant to the 1965 version of the statutes, we determined that "under property concepts one's interest in rental income is such as to deserve compensation under the 'just compensation' provision of the Wisconsin Constitution." *Id.* at 279. It was "undisputed that the pendency of the condemnation was the sole cause of the appellants' rental loss." *Id.* Since we determined that compensation for rental loss was constitutionally required under the just compensation clause of the Wisconsin Constitution, we held that Wis. Stat. § 32.19(4) (1965), insofar as it limited compensation for the taking to 12 months of rental losses, was unconstitutional. *Id.* at 283.[16]

¶ 18. In a subsequent examination of this issue, the court of appeals concluded that *Luber* "does not

---

[16] In a subsequent case, we expressly limited the holding in *Luber* to the 12–month limit for rental income losses found in Wis. Stat. § 32.19(4) (1965). *Rotter v. Milwaukee County Expressway & Transp. Comm'n*, 72 Wis. 2d 553, 562, 241 N.W.2d 440 (1976). In *Rotter*, we stated that a cause of action for all incidental damages was not created by *Luber*. *Id.* We also decided that claims for all constitutionally based damages must be presented to the condemnation commission to determine whether just compensation for the taking includes the claimed damage. *Id.* at 564. That is, such a claim is a monetary claim that must be addressed as part of the takings phase of condemnation when the commission is deciding the issue of just compensation. *Id.* The issues that CC Midwest may have

613

constitutionally mandate unlimited recovery for all consequential damages in eminent domain actions." *Hasselblad v. City of Green Bay*, 145 Wis. 2d 439, 442, 427 N.W.2d 140 (Ct. App. 1988). In *Hasselblad*, the court of appeals determined that Wis. Stat. § 32.19(4m), setting a $50,000 limit on business replacement damages for owner-occupied businesses, was not unconstitutional because there is no constitutional right to compensation for relocation expenses. *Id.* at 440–41. The court recognized that *Luber* was a "radical departure" from the prevailing rule that condemnation provides no recovery for consequential or incidental damages. *Id.* at 442–43. The court also stated that there was a rational basis for distinguishing the incidental damages awarded in *Luber* because "[r]ental losses bear a direct relationship to fair market value that business replacement expenses do not." *Id.* at 444.

¶ 19. The dissent of Justice Prosser disagrees that CC Midwest's argument has no constitutional just compensation component. He relies heavily on *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949), for the proposition that the United States Supreme Court modified its rule of denying consequential losses as part of just compensation. Justice Prosser's dissent, ¶¶ 83–87. However, the dissent misinterprets *Kimball Laundry*. In *Kimball Laundry*, the Court explained the different effects of a taking when it is only temporary and the owner is unable to transfer its business goodwill to another location.

> What, then, are the circumstances under which the Fifth Amendment requires compensation for such an

presented to the condemnation commission are not before us on this review, and CC Midwest has made no monetary counterclaim here.

intangible? Not, indeed, those of the usual taking of fee title to business property, but the denial of compensation in such circumstances rests on a very concrete justification: the going-concern value has not been taken. Such are all the cases, most of them decided by State courts under constitutions with provisions comparable to the Fifth Amendment, in which only the physical property has been condemned, leaving the owner free to move his business to a new location. . . . It is true that there may be loss to the owner because of the difficulty of finding other premises suitably situated for the transfer of his good will, and that such loss, like the cost of moving, is denied compensation as consequential.

*Kimball Laundry*, 338 U.S. at 11–12.

¶ 20. Accordingly, to fall within the rule set out in *Kimball Laundry*, the condemnor must take over the business opportunity, at least on a temporary basis, as well as taking the real property, such that the business owner could not move his business to a new location and may be required to renew his business at a location temporarily taken if the government quits the condemned site before the expiration of the condemnee's lease term. *See United States v. Westinghouse Elec. & Mfg. Co.*, 339 U.S. 261, 264–65 (1950) (concluding that where there is only a temporary occupancy by the condemnor, the cost of temporary removal of the owner is a compensable loss under the Fifth Amendment). Therefore, we disagree with Justice Prosser's dissent, as we have concluded that the usual rule that consequential damages are not part of constitutionally required just compensation applies here. This is so, in part,[17] because there are no facts to pull CC Midwest's claim into the

---

[17] Furthermore, as we have already explained, CC Midwest did not counterclaim for just compensation in this action by the City for a writ of assistance.

rule set out in *Kimball Laundry* or *Westinghouse Electric. See also United States v. 50 Acres of Land*, 469 U.S. 24, 33 (1984) (recognizing that absent a temporary taking, the Fifth Amendment does not require compensation for consequential damages arising from condemnation); *Cmty. Redev. Agency of L. A. v. Abrams*, 543 P.2d 905, 913, 916 (Ca. 1975) (concluding that when a condemnor "takes the fee upon which a business is conducted and does not by the nature of its action wholly preclude the condemnee from transferring its going-concern or goodwill value to another location," just compensation is not due for the costs of moving the business, and also suggesting that any remedy for relocation costs lies with the legislature); *Heir v. Del. River Port Auth.*, 218 F. Supp. 2d 627, 641–42 (D.N.J. 2002) (concluding that a Mobile Oil franchise that was lost as the result of condemnation was not a compensable taking under the Fifth Amendment).[18]

---

[18] Justice Prosser's dissent cites many cases that it proposes "undermine the foundations" of the rule against awarding consequential losses as part of condemnation. Justice Prosser's dissent, ¶ 87. However, in each of those cases the Supreme Court is not determining whether to award consequential damages, but rather, it is determining whether there was any "taking" of the claimed interest. *See Monongahela Navigation Co. v. United States*, 148 U.S. 312, 327–28 (1893) (determining that the fair market value of the property included its productiveness, which was the franchise to take tolls at the lock and dam, as that right was taken with the property itself); *Griggs v. County of Allegheny*, 369 U.S. 84, 88–90 (1962) (concluding that an air easement over property used by aircraft taking off and landing made the home unbearable so that the easement constituted a taking requiring just compensation); *United States v. Causby*, 328 U.S. 256, 261–66 (1946) (concluding an air easement was a taking); *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 575, 577–79 (1972) (concluding, in a case that did

¶ 21. In summary, we agree with the court of appeals' interpretation in *Hasselblad* and conclude that the relocation assistance benefits provided by Wis. Stat. § 32.19(3) and (4m) do not have a direct relationship to the fair market value of a tenant's interest, and therefore, are incidental or consequential damages that are not considered in the constitutional requirement for just compensation. Consequently, CC Midwest's affirmative defenses to the City's petition for a writ of assistance present us with questions of only statutory, not constitutional, interpretation.

C. Comparable Replacement Property/Business

¶ 22. To determine whether the writ of assistance was properly issued in this case, we must interpret Wis.

---

not involve condemnation, that many types of property interests are protected by due process); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04 (1984) (concluding, in an action that did not involve condemnation, that trade secrets may be property rights that would be protected by the Takings Clause); *Armstrong v. United States*, 364 U.S. 40, 48 (1960) (concluding that materialmen's liens on boat hulls are compensable property interests under the Takings Clause); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 601–02 (1935) (concluding that mortgages are protected by the Fifth Amendment and as such there were limitations on the bankruptcy power of Congress); *Lynch v. United States*, 292 U.S. 571, 579 (1934) (concluding that contracts the plaintiffs entered into with the federal government for "War Risk Insurance" are property rights protected by the Fifth Amendment). Therefore, while all the cases cited by Justice Prosser's dissent address Fifth Amendment property interests, none set aside the general rule that consequential business loss occasioned by a condemnation is not compensable under the Fifth Amendment.

Stat. § 32.05(8)(b)-(c) in regard to "comparable replacement property" and "made available" and Wis. Stat. § 32.19(2)(c) in regard to "comparable replacement business." Statutory interpretation "begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry." *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting *Seider v. O'Connell*, 2000 WI 76, ¶ 43, 236 Wis. 2d 211, 612 N.W.2d 659). Statutes are interpreted in the context in which they are used, "as part of a whole; in relation to the language of surrounding or closely-related statutes." *Id.*, ¶ 46. "[A] statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more senses." *Id.*, ¶ 47. If a statute is ambiguous, the court may examine external sources, such as legislative history and the purpose of the statute. *Id.*, ¶ 48.

¶ 23. Wisconsin Stat. § 32.05(8)(b)-(c) addresses writs of assistance sought subsequent to eminent domain proceedings and provides, in relevant part:

> (b) . . . The condemnor has the right to possession when the persons who occupied the acquired property vacate, or hold over beyond the vacation date established by the condemnor, whichever is sooner, except as provided under par. (c). If the condemnor is denied the right of possession, the condemnor may, upon 48 hours' notice to the occupant, apply to the circuit court where the property is located for a writ of assistance to be put in possession. The circuit court shall grant the writ of assistance if all jurisdictional requirements have been complied with, if the award has been paid or tendered as required and if the condemnor has made a comparable replacement property available to the occupants, except as provided under par. (c).

(c) The condemnor may not require the persons who occupied the premises on the date that title vested in the condemnor to vacate until a comparable replacement property is made available. This paragraph does not apply to any person who waives his or her right to receive relocation benefits or services under s. 32.197 or who is not a displaced person, as defined under s. 32.19(2)(e), unless the acquired property is part of a program or project receiving federal financial assistance.

Under the plain language of the statute, "there are three conditions precedent to the issuance of a writ of assistance: (1) compliance with all jurisdictional requirements; (2) payment or tender of the [relocation assistance] award; and (3) making available comparable replacement property to the occupants." *Dotty,* 257 Wis. 2d 377, ¶ 13 (quoting *City of Racine v. Bassinger,* 163 Wis. 2d 1029, 1035, 473 N.W.2d 526 (Ct. App. 1991)). At issue in this case are: (1) the meaning of "comparable replacement property" employed in § 32.05(8)(b)-(c); (2) the identification component of the "made available" obligation of § 32.05(8)(b)-(c); and (3) the meaning of "comparable replacement business" defined in Wis. Stat. § 32.19(2)(c).

¶ 24. "Comparable replacement property" is not defined in Wis. Stat. § 32.05(8)(b)-(c). However, we examine the language of surrounding or closely related statutes in order to interpret a statute in the context in which it is used. *Kalal,* 271 Wis. 2d 633, ¶ 46. The relocation assistance law, Wis. Stat. § 32.19 et seq., provides for payments to persons displaced by public projects in order that they be fairly compensated, not only for the property whose ownership is taken for a public purpose, but also for certain other financial

consequences described in § 32.19.[19] Section 32.19 is closely related to § 32.05.[20] For example, § 32.05(8)(c) expressly refers to the relocation assistance law and limits the requirement to make available a comparable replacement property to a "displaced person, as defined under s. 32.19(2)(e)," who has not waived his or her right to relocation assistance.

¶ 25. There are three categories of property occupiers for whom the condemnor may be obligated to make available a "comparable replacement property" to a "displaced person" when a writ of assistance is sought following the exercise of the power of eminent domain: (1) an occupier whose dwelling must be vacated,

[19] The declaration of purpose set out in Wis. Stat. § 32.19(1) provides:

> The legislature declares that it is in the public interest that persons displaced by any public project be fairly compensated by payment for the property acquired and other losses hereinafter described and suffered as the result of programs designed for the benefit of the public as a whole; and the legislature further finds and declares that, notwithstanding subch. II, or any other provision of law, payment of such relocation assistance and assistance in the acquisition of replacement housing are proper costs of the construction of public improvements.

[20] Wisconsin Stat. § 32.19 et seq. is the relocation assistance law, and the procedural steps for condemnation are found at Wis. Stat. §§ 32.04–32.185. While these statutes are related and sometimes overlap, they are separate and have different applications. *City of Racine v. Bassinger,* 163 Wis. 2d 1029, 1037 n.6, 473 N.W.2d 526 (Ct. App. 1991). In some instances, condemnations occur without involving the displacement of persons, businesses, or farm operations and the relocation assistance statutes do not apply. *Id.* Alternatively, the government may acquire property by means other than through condemnation and the relocation assistance statutes may apply. *Id.*

Wis. Stat. § 32.19(2)(b); (2) an occupier whose business operation must be vacated, § 32.19(2)(c); and (3) an occupier whose farming operation must be vacated, § 32.19(2)(d). Since the relocation assistance law is closely related to condemnation law, we conclude that the phrase "comparable replacement property" in Wis. Stat. § 32.05(8)(b)-(c) unambiguously includes all three categories of occupiers of property set out in § 32.19(2)(b)-(d).

¶ 26. Here, the identification component for a replacement property under Wis. Stat. § 32.05(8)(b)-(c) is linked to the meaning of "comparable replacement business." This is so because in order to fulfill the statutory directive of § 32.05(8)(b)-(c) when a business replacement is identified, it must be a business property that comes within the definition of Wis. Stat. § 32.19(2)(c). Business replacement payments can be due to an occupier who is either an owner, § 32.19(4m)(a), or a tenant, § 32.19(4m)(b). Therefore, because CC Midwest is a tenant, we must determine whether a "comparable replacement business" pursuant to § 32.19(2)(c) has been "made available" to this business tenant before a writ of assistance may issue pursuant to § 32.05(8)(b)-(c).

¶ 27. While it is not necessary to examine the legislative history behind Wis. Stat. § 32.05(8)(b)-(c) because we have concluded that "comparable replacement property" is unambiguous, we agree with the court of appeals' qualification that "a person displaced by a condemnation [must] have comparable replacement property made available *to the extent required by the relocation assistance law*." *Dotty*, 257 Wis. 2d 377, ¶ 13 (quoting *Bassinger*, 163 Wis. 2d at 1040). The Legislative Reference Bureau (LRB) analysis of the

original bill, 1981 S.B. 562, which created the language in § 32.05(8)(b)-(c) that requires a comparable replacement property to be made available, reveals that the statute was intended to clarify existing law and to create a new condition precedent to the issuance of a writ of assistance—not to create a new substantive right.[21] *Bassinger*, 163 Wis. 2d at 1040. Therefore, in order to determine the substantive rights and what must be done to satisfy the conditions precedent, the parties must look to the relocation assistance statutes that defined a comparable replacement business prior to the legislature's addition of the language in § 32.05(8) that requires a condemnor to make available a comparable replacement property.[22]

¶ 28. We also agree with the court of appeals' analysis regarding the 1991 legislative rearrangement of the language in Wis. Stat. § 32.05(8),[23] when it

---

[21] The Legislative Reference Bureau Analysis of 1981 S.B. 562 states, "[c]urrent law is unclear and contradictory in regard to the conditions and terms of continued occupancy by displaced persons during the period after acquisition but before displacement. This bill provides that no person may be required to move without at least 90 days' written notice from the condemnor and until a comparable replacement property is made available."

[22] The language in Wis. Stat. § 32.05(8) requiring a condemnor to make available a "comparable replacement property" was created by 1983 Wis. Act 27 § 877, while the definition of "comparable replacement business" in Wis. Stat. § 32.19 was created by 1979 Chapter 221 § 283e.

[23] 1991 Wis. Act 39, §§ 1030c-1030L, renumbered Wis. Stat. § 32.05(8) to § 32.05(8)(b), deleted "[i]n this subsection, 'condemnor' has the meaning given in s. 32.185" from § 32.05(8)(b) and created § 32.05(8)(a) using the exact same language; and deleted "that the condemnor may not require the persons who occupied the premises on the date title vested in the condemnor to vacate until a comparable replacement property is made

concluded that "[t]he legislative tinkering made no substantive changes to the relevant language of Wis. Stat. § 32.05(8) . . . . If anything, the linkage between the 'made available' requirement of § 32.05(8) and the relocation assistance law is strengthened by the 1991 revision." *Dotty*, 257 Wis. 2d 377, ¶ 18. In the June 14, 1991 draft of 1991 A.B. 91, the language proposed for § 32.05(8)(c) stated, "the condemnor may not require the persons who occupied the premises on the date title vested in the condemnor to vacate until a comparable replacement property is made available pursuant to s. 32.19."

¶ 29. While the parties do not dispute that the relocation assistance law determines the extent to which the condemnor is required to have "made available" a comparable replacement property, they do disagree over what the law requires by way of a replacement. The City contends that according to *Dotty*, all that is required in order to meet its obligation to a business tenant is to provide assistance in locating properties, obtaining renovation cost estimates for properties in which the condemnee expresses an interest, and tendering the maximum relocation assistance payments due to a tenant under circumstances where the cost of remodeling or construction would exceed the statutory maximums set out in Wis. Stat. § 32.19(4m)(b).

¶ 30. CC Midwest argues that *Dotty* is distinguishable because it addressed only the financial component of the condemnor's obligation to have "made available" a comparable replacement property. We agree

available" from § 32.05(8)(b) and created § 32.05(8)(c) using the same language with the addition of an exception for those who waive relocation assistance or are not displaced persons, unless the project receives federal financial assistance.

with CC Midwest. In *Dotty*, the court of appeals did not address the identification component of the "made available" obligation of Wis. Stat. § 32.05(8)(b)-(c) by considering the definition of a comparable replacement business. CC Midwest also contends that unless a comparable replacement business is identified that it can use, apparently without modification, it has the right to remain indefinitely in possession of the Property after legal title has passed to the City. Stated otherwise, CC Midwest contends that identification has not occurred here because the properties proposed as comparable replacement properties do not meet its interpretation of the statutory definition of a comparable replacement business. Accordingly, we focus on Wis. Stat. § 32.19(2)(c) to decide whether any of the properties the City identified satisfy the statutory definition of a "comparable replacement business."

¶ 31. We begin with the plain language of Wis. Stat. § 32.19(2)(c), interpreted in the context in which it is used and in relation to closely-related statutes. *Kalal*, 271 Wis. 2d 633, ¶ 46. Section 32.19(2)(c) provides:

> "Comparable replacement business" means a replacement business which, when compared with the business premises being acquired by the condemnor, is adequate for the needs of the business, is reasonably similar in all major characteristics, is functionally equivalent with respect to condition, state of repair, land area, building square footage required, access to transportation, utilities and public service, is available on the market, meets all applicable federal, state or local codes required of the particular business being conducted, is within reasonable proximity of the business acquired and is suited for the same type of business conducted by the acquired business at the time of acquisition.

¶ 32. CC Midwest and the dissents interpret this definition as commanding a condemnor to satisfy the statute in a temporal way. That is, both presume that Wis. Stat. § 32.19(2)(c) requires identification of a property from which CC Midwest could operate its business without modification of the property in any way. The City interprets § 32.19(2)(c) in relation to other relocation assistance provisions such that identification of a property that after some modification can be used to carry on CC Midwest's business is sufficient to satisfy its obligation to have "made available" a comparable replacement property pursuant to Wis. Stat. § 32.05(8)(b)-(c). Modification of property is not directly addressed in § 32.19(2)(c). However, both interpretations appear reasonable. Therefore, we conclude that the definition of "comparable replacement business" is ambiguous. *Kalal*, 271 Wis. 2d 633, ¶ 47.

¶ 33. Wisconsin Stat. § 32.19(2)(c) sets out a list of criteria to guide the condemnor in its identification of a comparable replacement business. Many of the listed criteria are qualified in a way that shows that in order to satisfy the statute, identification of a property identical to the property that was condemned is not necessary. As examples of such qualifications, we note that a property that is "reasonably similar" to the major characteristics of the condemned property is sufficient. § 32.19(2)(c). A property that is "adequate" for the needs of the business will suffice, and a property that is "functionally equivalent" in regard to condition, state of repair, land area, building square footage, access to transportation, utilities and public service is all the statute requires. *Id.* The replacement property should be "within reasonable proximity" of the condemned property. *Id.* The other criteria of § 32.19(2)(c) assure that the type of business for which a replacement

business is sought will be able to be conducted from the property suggested without running afoul of governmental regulations.

¶ 34. As we consider Wis. Stat. § 32.19(2)(c), we conclude that in some respects, this case is *Dotty* in a different dress. In *Dotty*, the condemnee argued that before a writ of assistance could be issued, the condemnor was required to make available a replacement business property that met the condemnee's criteria and could be acquired without expending a sum greater than the total of its condemnation award and relocation benefits. *Dotty*, 257 Wis. 2d 377, ¶ 10.[24] The cost to purchase and remodel the only property deemed worthy of further inquiry was "almost $1 million more than the [condemnor had] made available to [the condemnee] in its condemnation award and proposed relocation assistance payments." *Id.*, ¶ 4. Relying on *Bassinger*, the court stated that the condemnor was required to have made available a comparable replacement property *"to the extent required by the relocation assistance law."* *Id.*, ¶ 19 (quoting *Bassinger*, 163 Wis. 2d at 1040).[25] The court concluded that the condemnor "made available" a

---

[24] The criteria identified by the condemnee for its replacement property were: "(1) the property would have to be in the same vicinity as the condemned restaurant property; (2) Dotty [the condemnee] must be able to own (not lease) the property; and (3) acquisition of the replacement property would not increase Dotty's existing level of business indebtedness." *Dotty Dumpling's Dowry, Ltd. v. Cmty. Dev. Auth. of Madison*, 2002 WI App 200, ¶ 3, 257 Wis. 2d 377, 651 N.W.2d 1.

[25] The issue in *Bassinger* was the meaning of the term "occupant" in Wis. Stat. § 32.05(8), in order to determine whether the condemnor was required to make available a comparable replacement property. *Bassinger*, 163 Wis. 2d at 1039. The court determined that the term was ambiguous and the owner of a marina business would need to meet the

comparable replacement property to the necessary extent by: identifying potential replacement properties; obtaining renovation cost estimates for properties in which the condemnee expressed an interest; tendering the maximum business replacement payment; and offering to reimburse the condemnee for its other statutorily authorized relocation expenses. *Id.*, ¶ 21.

¶ 35. The court of appeals expressly rejected the condemnee's argument that implied that the condemnee would never have to vacate the condemned property if the condemnor could not identify a replacement property acceptable to the condemnee that could be acquired for an amount not exceeding the condemnation award plus relocation benefits. *Id.*, ¶ 26. The court stated that the condemnee's argument was "unreasonable and contrary to the legislative intent regarding the 'made available' requirement." *Id.* The court went on to state, "[t]he obligation of the condemning agency under [Wis. Stat.] § 32.19 is to *assist* in the procurement and acquisition of replacement property, not to make a displaced business financially whole regardless of the cost to the condemning agency." *Id.*, ¶ 27.

¶ 36. The court noted that under the relocation assistance law, the legislature expressly provided an exception to the statutory payment limits if a *comparable dwelling* was not available within the monetary limits. *Id.*, ¶ 28 (citing Wis. Stat. § 32.19(4)(c)). However, no such exception exists when a comparable

definition of displaced person in Wis. Stat. § 32.19(2)(e) in order for the condemnor to be required to make available a comparable replacement property. *Id.* at 1038–39. The court concluded that the owner of the marina business that rented slips, but conducted no commercial activities on the property, did not meet the definition of a displaced person. *Id.* at 1043.

replacement business is not available. *Id.* Therefore, the maximum financial obligation of the condemnor to a business remained capped by the statutory limits. *Id.* In addition, the relocation assistance statutes "plainly contemplate that some business-owners will opt not to relocate or ultimately be unsuccessful in doing so." *Id.*, ¶ 29 (citing Wis. Stat. § 32.19(3)(b) and (c); Wis. Admin. Code §§ Comm 202.56(4) and 202.58).

¶ 37. In addition, a business occupier's right to payment in regard to a replacement business is addressed in Wis. Stat. § 32.19(4m). As CC Midwest is a tenant-occupier business, it could be entitled to a maximum of $30,000 for a replacement business. § 32.19(4m)(b). However, any such entitlement is due only if CC Midwest "actually rents or purchases a comparable replacement business" property within the time limits set out in the statute. *Id.* Therefore, the definition of "comparable replacement business" found in § 32.19(2)(c) applies to both the City's obligation to have "made available" a comparable replacement property pursuant to Wis. Stat. § 32.05(8)(b)-(c) and CC Midwest's opportunity for a replacement payment under § 32.19(4m)(b).

¶ 38. CC Midwest contends that none of the properties the City proposed meet the definition of a comparable replacement business set out in Wis. Stat. § 32.19(2)(c).[26] If CC Midwest's statutory interpretation is correct, then under § 32.19(4m)(b), it would have no right to any payment for a replacement business if it

---

[26] Justice Wilcox notes that the City suggested vacant land sites as comparable replacement properties. Justice Wilcox's concurrence, ¶ 62 n.2. However, as his concurrence explains, CC Midwest voiced an interest in constructing its own, new facility. (*See* Adler Aff. at 10.) By identifying several parcels that had no structures on them, the City was responding to a

were to purchase or rent one of the properties suggested by the City and later modify that property. This is so because under CC Midwest's interpretation none of the properties would meet the § 32.19(4m)(b) requirement of being a "comparable replacement business."

¶ 39. However, Wis. Stat. § 32.19(2)(c), as interpreted in *Dotty*, implies that a business owner may need to expend sums greater than the condemnation award plus relocation assistance payments in order to obtain a comparable replacement property, if such property is not available absent some modification. *Dotty*, 257 Wis. 2d 377, ¶ 27. This reasonably suggests modification of the property identified. Alternatively, as referenced above, the statutes recognize that some business owners will opt not to relocate or may go out of business. *Id.*, ¶ 29. Such alternatives also indicate that a property occupier does not have the right to indefinitely remain in possession of property after an eminent domain acquisition simply because a replacement business is not identified that satisfies the occupier's definition of § 32.19(2)(c).

¶ 40. We conclude that the statutory language shows that relocation assistance provided under Wis. Stat. § 32.19(2)(c) does not require identification of a property that is identical to the property condemned or that, at the moment of identification, the property, without modification, can be used by the business that was relocated. *See Dotty*, 257 Wis. 2d 377, ¶ 21.[27] Rather, it requires identification of a property that with

---

possibility for CC Midwest that was suggested by its own representative, Tom Christ, in the relocation process. (*Id.* at 12.)

[27] When the court of appeals addressed identification of replacement business properties, it spoke of "potential replace-

modification can be used for the occupier's business. For example, the land area of a property identified may be sufficient, but the building may have been used for another purpose and may need remodeling in order for the business to carry on its activities as it has in the past.

¶ 41. That Wis. Stat. § 32.19(2)(c) does not require the identification of a property where no investment is required in order for the business to continue operating also is supported by Wis. Admin. Code § Comm 202, Relocation Assistance. For example, § Comm 202.96 addresses "Tenant Occupiers" who rent the location from which their businesses are conducted. It provides a "rental assistance" payment of up to $30,000, not only for rental assistance if the rental costs in a new location are higher than those costs were in the premises from which the business was ejected, § Comm 202.96(a), but also due to payments for modifications to the new premises if those costs are added to the rent, § Comm 202.96(b)1, or are paid by the tenant, § Comm 202.96(b)2.

¶ 42. As the court of appeals explained in *Dotty*, a condemnor has no open-ended obligation to provide a replacement property that is acceptable to the business being relocated. *Dotty*, 257 Wis. 2d 377, ¶¶ 26–27. To conclude otherwise would cause the upper limits on

ment properties." *Dotty*, 257 Wis. 2d 377, ¶ 21. Dotty had contended that Wis. Admin. Code § Comm 202.92(2)(b) and (d) required the payment of the costs of either renovation or new construction for the properties identified. *Id.*, ¶ 24 n.7. The court of appeals agreed that renovation or construction costs were a consideration in examining the Community Development Authority's statutory obligation. *Id.*, ¶ 21. However, it limited the amount of that obligation to the statutory cap for relocation expenses. *Id.*

relocation assistance payments to be meaningless. *Id.* Furthermore, interpreting Wis. Stat. § 32.19(c) to permit a tenant to remain in a property indefinitely, as though the lease were perpetual, conflicts with the proposition that the complete condemnation of a property terminates the lease.[28] *See Wis. Mall Props., LLC v. Younkers, Inc.*, 2006 WI 95, ¶ 27, 293 Wis. 2d 573, 717 N.W.2d 703 (concluding that "[c]omplete condemnation of a property terminates a lease attached to that property").

¶ 43. We also note that Wis. Stat. § 32.19(2)(c) is part of a statutory scheme wherein property is taken only for a public purpose. If a comparable replacement business pursuant to § 32.19(2)(c) were to require a property for which no modification was needed, some business properties condemned for public works projects never would be vacated due to the resources then available in the community. However, § 32.19(2)(c) requires a business replacement that is only "adequate," not one that is identical. Interpreting § 32.19(2)(c) otherwise, such that it would negate the opportunity to relocate a business if the resources available in a community were not sufficient to provide an identical business property, would prevent public works projects. Such an interpretation would ignore the context in which § 32.19(2)(c) occurs, contrary to our usual rules of statutory construction. *Kalal*, 271 Wis. 2d 633, ¶ 46. Accordingly, it is not reasonable to interpret § 32.19(2)(c) as requiring the displacing agency to identify a comparable replacement business that at the moment of identification can be used without modification.

---

[28] The record does not contain a lease between CC Midwest and Crown Enterprises, Inc., the owner of the real estate.

¶ 44. With this framework in mind, we turn to a comparison of the condemned property with one of those identified by the City. The condemned building had eight cross-docks, four end-doors and approximately 6,000 square feet of space. (Adler Aff. Ex. A at 7–10.) The Property had ten parking spaces and approximately nine acres. (*Id.*) However, only 3.2 acres of the Property was utilized for the building or graded for trucking use. (Boldt Rebuttal Aff. at 1.)

¶ 45. The property proposed as a comparable replacement business at 1700 East Delavan Drive, Janesville, was within a couple of miles of the condemned property. (Adler Dep. at 41, Oct. 23, 2003.) It already had more than 20 side-by-side docks for truck loading and unloading, a building with 120,000 square feet of space located on 9.68 acres of property, and more than ten spaces for parking trucks. (*Id.* at 42.) The only characteristic it appeared to lack was cross-docks. The City suggested that the long building with the current truck docks would need to be modified to add cross-docks. (*Id.*) CC Midwest offered no reason why cross-docks could not be constructed, and because CC Midwest was not interested in the facility, the City did not pursue the cost of adding cross-docks.

¶ 46. It appears from the record before us that the property at 1700 East Delavan Drive is reasonably similar to the condemned property in all its major characteristics and that with the addition of cross-docks to the building, it will be functionally equivalent under Wis. Stat. § 32.19(2)(c). In addition, as a prior trucking facility, there are apparently no governmental regulations that would prevent CC Midwest's trucking operation. Therefore, we conclude that the identified property at 1700 East Delavan Drive is adequate for the

needs of CC Midwest's "less than truck-load business," and meets the definition set out in § 32.19(2)(c).[29]

¶ 47. CC Midwest refused to consider this property or any of the other properties that the City identified. On October 7, 2002, Thomas Christ, speaking on behalf of CC Midwest, explained that a property would be a "suitable replacement" only if it had the following attributes: at least 10.5 acres;[30] topography suitable for CC Midwest's building plans;[31] access to roads; M-2 zoning; adjacent to the Union Pacific Rail;[32] and within a two-mile distance from the General Motors plant.[33] While the attributes that CC Midwest requested in a replacement property may be those that are best for CC Midwest's business, they are not neces-

---

[29] The property at 3913 Whitney Street may also have met the Wis. Stat. § 32.19(2)(c) definition of a comparable replacement business. It had cross-docks already in place, and the City's consultant said it could be used by CC Midwest. (Adler Dep. at 47–49.) CC Midwest refused to consider it because it said its trucks, at 65 feet in length, were too large to maneuver into position. (Adler Aff. Ex. H at 39–40, incorporating letter and drawing from Tom Christ.) Because the circuit court did not resolve this factual dispute, we do not address it here.

[30] Of the approximately nine acres condemned here, CC Midwest was able to use only 3.2 acres for its building and parking areas. (*See* Boldt Rebuttal Aff. at 1 in support of the City's petition for writ of assistance.)

[31] CC Midwest was a tenant of the condemned property that was owned by its parent company. However, as mentioned earlier, CC Midwest was considering construction of its own facility. (Adler Aff. Ex. A at 10.)

[32] The condemned property had no rail spur or direct access to a rail line. (*See* Boldt Aff. at 2 in support of the City's petition for writ of assistance.)

[33] CC Midwest earlier had explained that its service area covered south central Wisconsin. (*See* Ryan Aff. at 6.)

sary to fulfill the statutory parameters of Wis. Stat. § 32.19(2)(c).

¶ 48. Similar to the condemnor in *Dotty*, the City identified potential replacement properties that it has concluded satisfy the statutory requirements and could be modified for CC Midwest's business. The City also has tendered the maximum business replacement payment, and offered to reimburse CC Midwest for other statutorily authorized relocation expenses.[34] CC Midwest does not contest that the City tendered the maximum business replacement payment and offered reimbursement for statutorily authorized relocation expenses. As with the condemnee in *Dotty*, CC Midwest argues that it cannot be required to vacate the condemned property if a comparable replacement business under its interpretation of Wis. Stat. § 32.19(2)(c) is not provided. We reject this argument as unreasonable and contrary to the legislative directive. We conclude that the City has complied with its obligations here because one or more of the properties identified could, with modification, be used by CC Midwest to continue its business.

## III. CONCLUSION

¶ 49. We conclude that in satisfying its statutory obligation to make available a comparable replacement property pursuant to Wis. Stat. § 32.05(8)(b)-(c), prior to being entitled to a writ of assistance, the City must proceed to identify one or more properties that meet the parameters of Wis. Stat. § 32.19(2)(c) to serve as a comparable replacement business. Because we conclude

---

[34] CC Midwest did not express interest in any of the properties, so obtaining renovation cost estimates is not an issue in this case.

that the City has done so and has made no contrary concession in this regard, we reverse the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 50. JON P. WILCOX, J. *(concurring)*. When the legislature acts related to condemnation, it strikes a balance. *See* Wis. Stat. Ch. 32 (2003–04). On one hand, there is Wisconsinites' right to property, be it in their homes or businesses. On the other hand, there is the government power of eminent domain. While eminent domain often serves a common good, Wisconsinites' right to property is fundamental to the principles upon which this country was founded. So fundamental that it has been said "the great and chief end . . . of men's uniting into commonwealths and putting themselves under government is the preservation of their property."[1] The protection of property rights is embedded in the Bill of Rights, *see* U.S. Const. amend. V, and the Wisconsin Constitution, *see* art. I, § 13.

¶ 51. Reading the plain language enacted by the legislature, it becomes evident that it struck a balance that protected an individual's right to his or her property "until a comparable replacement property [was] made available." Wis. Stat. § 32.05(8)(c). This ensured that before the government could remove an individual from his or her property, an actual "comparable replacement property" had to be given in return. Providing a "comparable replacement property" in the business context requires the government to satisfy the criteria of Wis. Stat. § 32.19(2)(c).

---

[1] John Locke, *Two Treatises of Government* 184 (Cook ed., Hafner 1947) (1690).

¶ 52. The majority concludes that § 39.19(2)(c) is ambiguous. I disagree. Accordingly, I concur.

I

¶ 53. In defining types of "comparable replacement property," the legislature provided an extensive list of criteria that dictates what properties actually constitute "comparable replacement property" in different contexts. Specifically, different criteria exist for a replacement property to constitute a "comparable dwelling," Wis. Stat. § 32.19(2)(b), "comparable replacement business," Wis. Stat. § 32.19(2)(c), or "comparable replacement farm operation," Wis. Stat. § 32.19(2)(d). As enacted, these definitions ensure that the government finds a property that satisfies certain criteria, in exchange for an individual losing his or her property.

¶ 54. Wisconsin Stat. § 32.19(2)(c) provides that:

"[c]omparable replacement business" means a replacement business which, when compared with the business premises being acquired by the condemnor, is adequate for the needs of the business, is reasonably similar in all major characteristics, is functionally equivalent with respect to condition, state of repair, land area, building square footage required, access to transportation, utilities and public service, is available on the market, meets all applicable federal, state or local codes required of the particular business being conducted, is within reasonable proximity of the business acquired and is suited for the same type of business conducted by the acquired business at the time of acquisition.

¶ 55. The plain language of the definition, and the grammatical choices the legislature made, establish that a property proposed by a government must satisfy

636

a number of criteria before it constitutes a "comparable replacement business." The conjunctive list provides criteria that must be satisfied.

¶ 56. Each criterion provided in the list begins with the same word: "is." The distinct criteria are then conjoined with the word "and." Put another way, the legislature provided that a "comparable replacement business" must satisfy each of the following criteria:

(1) [I]s adequate for the needs of the business;

(2) [I]s reasonably similar in all major characteristics;

(3) [I]s functionally equivalent with respect to condition, state of repair, land area, building square footage required, access to transportation, utilities and public service;

(4) [I]s available on the market, meets all applicable federal, state or local codes required of the particular business being conducted;

(5) [I]s within reasonable proximity of the business acquired; *and*

(6) [I]s suited for the same type of business conducted by the acquired business at the time of acquisition.

*See* Wis. Stat. § 32.19(2)(c). The legislature did not use the word "or" as the conjunction at the end of the list. The legislature did not preface the criteria with any words that would indicate that a property's potential for modifications should be considered. The legislature used the word "is" to preface each criterion, not "could be."

637

¶ 57. In introducing the list, the legislature has also made clear that in assessing whether the government has satisfied each criterion on the list, the proposed "comparable replacement business" must be compared to the existing business. The legislature provided, "when compared with the business premises being acquired by the condemnor . . . ." Wis. Stat. § 32.19(2)(c). The focus on the comparison of the two properties stresses that whether a proposed property constitutes a "comparable replacement business" depends on the specifics of the existing business. It is not good enough for the government to merely come up with some generic "business land," and move on with the condemnation process.

¶ 58. Wisconsin Stat. § 32.19(2)(c) does not provide a draconian list of criteria. Rather, a number of the § 32.19(2)(c) criteria provide a government leeway to ensure they do not have the nearly impossible task of making available an identical property. For instance, a replacement business must merely be "adequate" for the needs of the business. All the major characteristics need be only "reasonably similar." The replacement need be only within "reasonable proximity" of the business acquired. If the property had to be identical, it seems the replacement would need to be more than adequate, actually similar in its major characteristics, and in close proximity to the acquired business. As the legislature promulgated § 32.19(2)(c), a government must satisfy six distinct and reasonable criteria.

¶ 59. Upon reviewing the language enacted by the legislature, I fail to see any ambiguity.

II

¶ 60. I agree with the majority that the 1700 East Delavan Drive property constituted a "comparable replacement property."

¶ 61. Some of the other properties the City proposed were not even close to satisfying the § 32.19(2)(c) criteria. For instance, five of the properties were not in south central Wisconsin. Rather, they were in communities as far away as Neenah and Wausau. Both communities are over 100 miles away from the existing business in this case. Given that a "comparable replacement business" must be "within reasonable proximity of the business acquired," these properties constitute bizarre proposals. For a "less than truckload" business that was part of an established multi-state network, with established client such as the General Motors plant in Janesville, properties that would result in hours more of driving hardly seem to constitute being within a "reasonable proximity" of the existing business.

¶ 62. Ten of the properties proposed by the City were vacant lots. Criterion three provides that the proposed property must be "functionally equivalent with respect to condition, state of repair, land area, building square footage required, access to transportation, utilities and public service." In light of this requirement, it is hard to conclude that vacant lots could constitute "comparable business property." Vacant lots do not have things like "building square footage."[2]

---

[2] The record indicates that at one point CC Midwest voiced an interest in constructing a new facility. This purportedly explains why vacant lots may satisfy Wis. Stat. § 32.19(2)(c). Majority op., 38 n. 26.

Wisconsin Stat. §§ 32.05(8)(b)-(c) and 32.19(2)(c) provide the criteria a government must satisfy if they seek a writ of assistance. Nevertheless, a land owner or renter may choose to accept less than they are entitled to by statute. In this case, CC Midwest considered accepting less than the statutory criteria required. Then, it changed its mind and decided vacant lots

¶ 63. I raise the nature of some of the properties proposed by the City merely to reiterate that a government does not satisfy its § 32.19(2)(c) burden simply by proposing numerous properties.

¶ 64. For the reasons stated, I concur.

¶ 65. ANN WALSH BRADLEY, J. (*concurring*). I agree with that part of the opinion that constitutes the majority opinion: the City of Janesville must identify one or more properties that meet the parameters of Wis. Stat. § 32.19(2)(c) to serve as a comparable replacement business. The record demonstrates that the City has done so here. I write separately, however, as I cannot join that part of the opinion that constitutes only a lead opinion because it reaches out and unnecessarily discusses and decides a constitutional issue that was not advanced by either of the parties.[1] I believe that it is unwise for this court to sua sponte raise and decide constitutional issues without the benefit of briefs and arguments. Because the lead opinion's constitutional discussion leaves lingering questions, I respectfully concur.

¶ 66. It is not the role of this court to sua sponte resurrect and decide abandoned constitutional arguments. CC Midwest affirmatively abandoned its consti-

were not acceptable, which was the position it has had since Janesville sought the writ of assistance. Nothing in the statute suggests CC Midwest forfeited its ability to object to properties that did not meet the criteria because it considered an alternative earlier in the process.

[1] As noted in footnote 10 of the majority/lead opinion, only three justices join the discussion of the constitutional issues. Therefore, that portion constitutes only a lead opinion and not an opinion of the majority of the court.

tutional argument in this court. It stated that it seeks "only to be protected to the extent guaranteed by the relocations law."[2]

¶ 67. As I see it, the courts play a passive role in our system of government. Unlike the legislative or the executive branch of government which have as their regular fare the responsibility to raise and resolve the issues of the day, our role is to respond to the issues presented. This is true in all areas of the law, but especially true when it comes to constitutional issues. The wisdom of such restraint is apparent.

¶ 68. The rule of law is generally best developed when issues are raised by the parties and then tested by the fire of adversarial briefs and oral arguments. Indeed, "[t]he fundamental premise of the adversary process is that these advocates will uncover and present more useful information and arguments to the decision maker than would be developed by a judicial officer acting on his own in an inquisitorial system." Adam A. Milani & Michael R. Smith, *Playing God: A Critical Look at Sua Sponte Decisions By Appellate Courts*, 69 Tenn. L. Rev. 245, 247 (2002), citing *United States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring).

---

[2] The lead opinion proffers excuses for its reaching out and asserts that "before the court of appeals, CC Midwest argued its claim had a constitutional foundation . . . ." Lead op., ¶ 15 n. 13. The court of appeals, however, did not address the constitutional takings issue. There was no cross-petition or brief filed by CC Midwest on the takings issue. The City of Janesville did preemptively discuss the constitutional issue in its brief because as the petitioner it had to file its brief first. However, CC Midwest did not respond to the issue. Such proffered excuses in reality provide no excuse at all. The opinion simply ignores the fact that CC Midwest affirmatively abandoned its constitutional argument in this court.

¶ 69. Nevertheless, the lead opinion launches its constitutional analysis. It revisits our conclusion in *Luber*, where we discussed the interests of an owner of property and concluded that "under property concepts one's interest in rental income is such as to deserve compensation under the 'just compensation' provision of the Wisconsin Constitution." *Luber v. Milwaukee County*, 47 Wis. 2d 271, 279, 177 N.W.2d 380 (1970). Lead op., ¶ 17. Furthering its constitutional analysis, the lead opinion notes that this court in *Rotter* limited the holding of *Luber* to the statutory twelve-month limit for rental income losses, but warned that "payment and time limits set forth in sec. 32.19 may encounter constitutional difficulties." *Rotter v. Milwaukee County Expressway & Transp. Comm'n*, 72 Wis. 2d 553, 562–63, 241 N.W.2d 440 (1976). Lead op. ¶ 17 n. 16.

¶ 70. Citing *Hasselblad v. City of Green Bay*, 145 Wis. 2d 439, 442, 427 N.W.2d 140 (Ct. App. 1988), the lead opinion observes that in a subsequent examination, the court of appeals concluded that *Luber* did not "constitutionally mandate unlimited recovery for all consequential damages in eminent domain actions." It explains that in *Hasselblad* the court of appeals held "that Wis. Stat. § 32.19(4m), setting a $50,000 limit on business replacement damages for owner-occupied businesses, was not unconstitutional . . . ." *Id.* at 440–41. Lead op., ¶ 18.

¶ 71. Ultimately, the lead opinion concludes its constitutional analysis with the determination that "the relocation assistance benefits provided by Wis. Stat. § 32.19(3) and (4m) do not have a direct relationship to the fair market value of a tenant's interest, and therefore, are incidental or consequential damages that are

not considered in the constitutional requirement for just compensation." Lead op., ¶ 21.

¶ 72. The lead opinion's constitutional analysis leaves lingering questions about the nature of just compensation that were not presented or advanced for purposes of this review. The text of the analysis leaves the reader wondering:

- Is the lead opinion expanding the holding in *Hasselblad?*

 The lead opinion describes the holding in *Hasselblad* as follows: "In *Hasselblad,* the court of appeals determined that Wis. Stat. § 32.19(4m), setting a $50,000 limit on business replacement damages for owner-occupied businesses, was not unconstitutional . . . ." Lead op., ¶ 18. Yet, the lead opinion's holding goes beyond the statute relied upon in *Hasselblad.* It appears to extend the holding to a different statute, Wis. Stat. 32.19(3). The opinion concludes that neither the relocation assistance benefits provided for in Wis. Stat. § 32.19(3) nor the benefits in § 32.19(4m) are constitutionally mandated. Lead op., ¶ 21.

- Are the interests of a tenant different than the interests of an owner for purposes of the lead opinion's constitutional analysis?

 The cases primarily relied upon by the lead opinion in its constitutional discussion, *Luber, Rotter,* and *Hasselblad,* are cases involving the interests of owners of property. Midwest is a tenant, not an owner.[3]

---

[3] In its constitutional analysis, the lead opinion cites to only one case that concerns the right of a tenant to just compensation. In *United States v. Petty Motor Co.,* 327 U.S. 372 (1946), the United States Supreme Court determined that when the gov-

- As a threshold matter, does the record even support embarking on a constitutional "takings" analysis?

 It is unclear whether the record supports that Midwest, as a tenant, had *any* legally protected leasehold interest in continued occupancy of the property that could be a "taking."

¶ 73. This court in *Rotter* warned that "payment and time limits set forth in sec. 32.19 may encounter constitutional difficulties." *Rotter*, 72 Wis. 2d at 562–63. Here, without prompting or argument, the lead opinion lifts Wis. Stat. § 32.19(3) and (4m) from the clouds of constitutional difficulty contemplated by this court in *Rotter*. Perhaps the lead opinion is correct in its constitutional conclusions. Without argument and briefs I am unsure. However, there is one thing about which I am sure: the rule of law is best developed when issues are raised by the parties and then tested by the fire of adversarial argument.

¶ 74. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this concurrence.

¶ 75. DAVID T. PROSSER, J. (*dissenting*). When the court of appeals certified this eminent domain case to our court, it pointed to the difficulty of interpreting and applying the statutory language in Wis. Stat.

---

ernment took over temporary use of a building for a period beginning in 1942 and ending in 1945 with a right to surrender in 1943 or 1944 on 60 days notice, that relocation and incidental expenses were not admissible for the purpose of determining the market value of the tenants' leaseholds. *Id.* at 377–78. In this case, there is no question presented about the market value of the leasehold of CC Midwest. Rather, the issue presented is solely whether the City of Janesville complied with its statutory requirement of making available comparable rental properties.

§§ 32.05 and 32.19. It also recognized the statewide implications of a decision on this subject. After this court declined to grant the certification, the court of appeals undertook a careful review of the statutes as well as the cases and policy, actively participated in more than three hours of oral argument, and then produced an outstanding appellate opinion that is linear, clear, and highly persuasive. *City of Janesville v. CC Midwest, Inc.*, 2006 WI App 21, 289 Wis. 2d 453, 710 N.W.2d 713. I believe the court of appeals decision should be affirmed. Because the majority believes otherwise, I respectfully dissent.

## CONSTITUTIONAL PRINCIPLES

¶ 76. The Fifth Amendment to the United States Constitution provides in part that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The United States Supreme Court has applied this private property protection to the states through the Fourteenth Amendment. *See Palazzolo v. Rhode Island,* 533 U.S. 606, 617 (2001) (citing *Chicago, Burlington & Quincy R.R. Co. v. City of Chicago,* 166 U.S. 226 (1897)). Similarly, the Wisconsin Constitution provides in Article I, Section 13 that "The property of no person shall be taken for public use without just compensation therefor." Wis. Const. art. I, § 13.

¶ 77. These two "takings" provisions embody a number of core principles. In the discharge of its duties, a government may appropriate private property, but it may not do so without being liable to the obligation to pay just compensation. *United States v. Lynah,* 188 U.S. 445, 465 (1903). This obligation bars the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the

public as a whole." *Dolan v. City of Tigard,* 512 U.S. 374, 384 (1994); *Armstrong v. United States,* 364 U.S. 40, 49 (1960).

¶ 78. The phrase "just compensation" evokes ideas of fairness and equity. *United States v. Va. Elec. & Power Co.,* 365 U.S. 624, 631 (1961). "The guiding principle of just compensation is reimbursement to the owner for the property interest taken." *Id.* at 633. The owner shall receive the "full monetary equivalent" of what he loses. *United States v. Reynolds,* 397 U.S. 14, 16 (1970). He is entitled to be put in as good a position pecuniarily as if his property had not been taken. *Olson v. United States,* 292 U.S. 246, 255 (1934).

¶ 79. Historically, these salutary principles have been largely disregarded in the compensation of business owners whose business interests have been damaged or destroyed by government condemnation of underlying land. *See* Lynda J. Oswald, *Good Will and Going-Concern Value: Emerging Factors in the Just Compensation Equation,* 32 B.C. L. Rev. 283 (1991). The "business losses rule," according to Professor Oswald, limits constitutionally required compensation to the "value of the real property and fixtures taken." Oswald, *supra,* at 286. Thus, historically, most business owners have not had a constitutional basis to recover for "lost profits during the relocation period, permanent reduction in profits because of the loss of an advantageous location, or the complete destruction of good will or going-concern value where a business cannot be relocated." Oswald, *supra,* at 286–87. Business owners often have not been able to recover even if the difficulties of relocating put them out of business. Oswald, *supra,* at 287. The business losses rule is what the Supreme Court summarized in *United States v. Petty Motor Co.,* 327 U.S. 372 (1946), cited by the majority at ¶ 16.

¶ 80. Over time, the business losses rule has been subject to withering criticism because it conflicts with the plain language of the Fifth Amendment and because it can be so palpably unfair to business interests.[1]

¶ 81. In addition, a body of federal and state court decisions, as well as federal and state legislative reforms, have eroded the business losses rule and changed the atmosphere for evaluating just compensation claims. Constitutional law on just compensation has not remained static.

¶ 82. To illustrate, the majority opinion quotes from *Petty Motor Co.*, which stated:

---

[1] *See generally* Nathan Bursdal, *Just Compensation and the Seller's Paradox*, 20 BYU J. Pub. L. 79 (2005); Charles M. Cork, *A Critical Review of the Law of Business Loss Claims in Georgia Eminent Domain Jurisprudence*, 51 Mercer L. Rev. 11 (1999); Michael DeBow, *Unjust Compensation: The Continuing Need for Reform*, 46 S.C. L. Rev. 579 (1995); Roger Clegg, *Reclaiming the Text of the Takings Clause*, 46 S.C. L. Rev. (1995); Alan T. Ackerman, *Just Compensation for the Condemnation of Going Concern Value*, 64 Mich. Bar J. 1314 (1985); D. Michael Risinger, *Direct Damages: The Lost Key to Constitutional Just Compensation When Business Premises are Condemned*, 15 Seton Hall L. Rev. 483 (1985); Gideon Kanner, *When is "Property" not "Property Itself": A Critical Examination of the Bases of Denial of Compensation for Loss of Goodwill in Eminent Domain*, 6 Cal. W. L. Rev. 57 (1969); Frank A. Aloi & Arthur Abba Goldberg, *A Reexamination of Value, Good Will, and Business Losses in Eminent Domain*, 53 Cornell L. Rev. 604 (1968); Comment, *"Just Compensation" for the Small Businessman*, 2 Colum. J.L. & Soc. Probs. 144 (1966); Comment, *An Act to Provide Compensation for Loss of Goodwill Resulting from Eminent Domain Proceedings*, 3 Harv. J. on Legis. 445 (1965); Emerson G. Spies & John C. McCoid, II, *Recovery of Consequential Damages in Eminent Domain*, 48 Va. L. Rev. 437 (1962); Comment, *Eminent Domain Valuations in an Age of Redevelopment: Incidental Losses*, 67 Yale L.J. 61 (1957); Robert Kratovil & Frank J. Harrison, Jr., *Eminent Domain—Policy and Concept*, 42 Cal. L. Rev. 596 (1954).

The Constitution and the statutes do not define the meaning of just compensation. But it has come to be recognized that just compensation is the value of the interest taken. . . . It is recognized that an owner often receives less than the value of the property to him but experience has shown that the rule is reasonably satisfactory. Since "market value" does not fluctuate with the needs of condemnor or condemnee but with general demand for the property, evidence of loss of profits, damage to good will, the expense of relocation and other such consequential losses are refused in federal condemnation proceedings.

*Petty Motor Co.,* 327 U.S. at 377–78. In this passage, the Court states that it is "reasonably satisfactory" when a business owner receives less than the value of his property, but it does not explain why this is reasonably satisfactory to the owner.

¶ 83. The truth is, the Supreme Court deviated from the business losses rule three years after *Petty Motor* in *Kimball Laundry Co. v. United States,* 338 U.S. 1 (1949). The United States had taken possession of a laundry during World War II so that it could be used temporarily for the Army. "Having no other means of serving its customers, the Laundry suspended business for the duration of the Army's occupancy." *Id.* at 3. Over government objection, the Court upheld an award of $70,000 annual rent to the owners, saying:

We agree with both lower courts . . . that the proper measure of compensation is the rental that probably could have been obtained . . . . [I]f the difference between the market value of the fee on the date of taking and that on the date of return were taken to be the measure, there might frequently be situations in which the owner would receive no compensation whatever.

*Id.* at 7.

¶ 84. But then the Court said more: "[W]hen the Government has condemned business property with the intention of carrying on the business . . . the taker acquires going-concern value, [and] it must pay for it." *Id.* at 12. "The Government's temporary taking of the Laundry's premises could no more completely have appropriated the Laundry's opportunity to profit from its trade routes than if it had secured a promise . . . that it would not for the duration of the Government's occupancy of the premises undertake to operate a laundry business anywhere else in the City." *Id.* at 14. "The temporary interruption as opposed to the final severance of occupancy so greatly narrows the range of [the condemnee's] alternatives . . . that it substantially increases the condemnor's obligation to him." *Id.* at 15. "We conclude . . . that since the Government for the period of its occupancy of petitioner's plant has for all practical purposes preempted the trade routes, it must pay compensation for whatever transferable value their temporary use may have had." *Id.* at 16. In short, the Court ordered payment of "consequential" losses.

¶ 85. In his concurrence, Justice Rutledge remarked that the Court had "recognized the possible compensability of intangible interests." *Id.* at 22 (Rutledge, J., concurring).

¶ 86. The dissent viewed the decision as "new constitutional doctrine." *Id.* at 22 (Douglas, J., dissenting). "The truth of the matter is that the United States is being forced to pay not for what it gets but for what the owner loses." *Id.* at 23. The dissent's opening salvo—"The United States took this plant in order to run a laundry for the Army, not for the public"—is so bogus that it illustrates why judicial attempts to defend the business losses rule have often failed. *Id.* at 22.

¶ 87. The *Kimball Laundry* case is only one of several Supreme Court decisions that undermine the foundations of the business losses rule. More than a century ago, the Supreme Court considered a case in which the United States condemned a company's lock and dam. *Monongahela Navigation Co. v. United States,* 148 U.S. 312 (1893). The Court held that the company was entitled to recover compensation for the *franchise* to exact tolls as well as the value of the tangible property taken. *Id.* at 345. In other cases, the Court has protected leasehold interests,[2] easements,[3] and intangible interests such as government entitlements,[4] trade secrets,[5] liens,[6] and contracts in takings.[7] The Court's decisions on *takings by government regulation* show the fluidity in takings law. See *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415–16 (1922), in which Justice Holmes observed that, "The general rule . . . is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Id.* at 415. He added that, "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Id.* at 416.[8]

---

[2] *United States v. Petty Motor Co.,* 327 U.S. 372 (1946).

[3] *Griggs v. County of Allegheny,* 369 U.S. 84 (1962); *United States v. Causby,* 328 U.S. 256 (1946).

[4] *Board of Regents of State Colleges v. Roth,* 408 U.S. 564 (1972).

[5] *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986 (1984).

[6] *Armstrong v. United States,* 364 U.S. 40 (1960); *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555 (1935).

[7] *Lynch v. United States,* 292 U.S. 571 (1934).

[8] The majority opinion attempts to distinguish cases cited in this discussion on the basis that they concern takings and not

¶ 88. In Wisconsin in 1970 this court issued a landmark decision *discarding* the rule that "consequential" damages are to be "suffered in legal silence." *Luber v. Milwaukee County,* 47 Wis. 2d 271, 276, 283, 177 N.W.2d 380 (1970). The court invalidated a statutory. limitation on one form of "consequential" damages. The court's complete and measured opinion cited scholarly criticism of the business losses rule, several of this court's previous opinions, recent Wisconsin legislation providing relocation benefits to property owners, and the Wisconsin Constitution to explain and support its decision.

¶ 89. The *Luber* opinion's "discard" of the business losses rule on state constitutional grounds may be subject to reconsideration.[9] But this court may not

awards of consequential damages. Majority op., ¶ 20 n.18. However, as the definition of "taking" has broadened over the years, the broadening of "just compensation" has followed accordingly. The majority fails to acknowledge that today just compensation for a taking may include what previously has been categorized as consequential damages.

[9] The majority contends that this court "expressly limited the holding in *Luber* to the 12–month limit for rental income losses." Majority op., ¶ 17 n.16 (citing *Rotter v. Milwaukee County Expressway & Transp. Comm'n,* 72 Wis. 2d 553, 562–63, 241 N.W.2d 440 (1976)). I disagree. The crux of *Rotter* is to require strict compliance with the procedure in the condemnation statute even when making claims for consequential damages. The *Rotter* court stated:

> [In *Luber*], owners of condemned property, sought recovery for rent loss for thirty-two months even though the statute only allowed recovery for rent loss for the twelve months preceding condemnation. Our court majority held that the plaintiffs were entitled to the entire rent loss amount, *placing such entitlement on constitutional grounds. . . . Luber* placed the thirty-two month rent loss within the items of compensable items of damage under sec. 32.19, Stats. *It did not create a new category of "incidental" or*

undo legislation adopted in the wake and spirit of *Luber* simply because the court might not agree with it. The majority opinion materially weakens current state legislation, and, unfortunately, this action may trigger the very litigation on constitutional issues that Wis. Stat. ch. 32 seeks to avoid.

¶ 90. This case does not require us to decide constitutional issues about the scope of just compensation because we are asked to interpret statutes. But a decision from this court substituting elusive and am-

> *"consequential" damages which could be brought directly to court without regard to the statutory procedure as to claims and without meeting the requirement of filing a claim with the commission or public body involved in a taking before going to court.*
>
> The *Luber* holding is to be read and limited to its holding that the twelve-month limit as to rent losses allowable was constitutionally invalid. It is true, as *Luber* noted, that when property is taken by condemnation "incidental damages are very apt to occur." That is not to say that a cause of action for compensation for incidental damages has been created that has no basis or relatedness to the items made compensable by sec. 32.19, Stats. *It means only that payment and time limits set forth in sec. 32.19 may encounter constitutional difficulties . . . .* This does not alter the mandated procedural steps set forth in sec. 32.20, for the making of any and all claims by condemnees.
>
> . . . All claims for compensation by condemnees must be filed with the commission or public body involved within the two-year time limit set by the statute. It is only after disallowance of such claims by such commission or public body that there is a right to take the claim or the challenge to commission disallowance to court.

*Id.* at 562–64 (emphasis added) (internal citations omitted).

In this case, CC Midwest has not concocted a novel constitutional claim for compensation. CC Midwest is insisting that the City of Janesville comply with the statute. It is the city's failure to comply with the statute that creates "constitutional difficulties."

biguous "parameters" for the statutory requirement that a condemnor timely identify currently available "comparable replacement property" satisfying certain criteria, is bound to stir up legislative reaction.

## COURT OF APPEALS DECISION

¶ 91. In its decision, the court of appeals explained that CC Midwest contended the City of Janesville was not entitled to a writ of assistance to remove CC Midwest because the City had not first made available a "comparable replacement property" as required by Wis. Stat. § 32.05(8)(b) and (c). *City of Janesville v. CC Midwest, Inc.*, 2006 WI App 21, ¶ 6, 289 Wis. 2d 453, 719 N.W.2d 713. There was no dispute that the properties nominated by the City were not comparable replacement properties *at the time CC Midwest was ordered to leave the property.* This was conceded by the City in oral argument on November 22, 2005. Thus, the court of appeals addressed the legal question of what the City was required to do under the statutes to qualify for a writ of assistance. The court treated this question as a matter of statutory interpretation.

¶ 92. I cannot improve on the court's analysis of the statute. Consequently, I insert here paragraphs 11–19, 26, 28, 30, and 31 from Judge Vergeront's opinion. At the conclusion of these 13 paragraphs, I will add supplementary analysis.

¶ 11 WISCONSIN STAT. § 32.05 provides the procedure for certain municipalities to follow when condemning land for certain public projects, and the parties agree that this is the applicable section. After describing the procedure for acquiring title and determining the amount of compensation to the property owner, this section addresses the occupants of the property and provides in part:

**Condemnation for sewers and transportation facilities. (8)** OCCUPANCY; WRIT OF ASSISTANCE; WASTE.

. . . .

(b) No person occupying real property may be required to move from a dwelling or move his or her business or farm without at least 90 days' written notice of the intended vacation date from the condemnor. The displaced person shall have rent-free occupancy of the acquired property for a period of 30 days, commencing with the next 1st or 15th day of the month after title vests in the condemnor, whichever is sooner. Any person occupying the property after the date that title vests in the condemnor is liable to the condemnor for all waste committed or allowed by the occupant on the lands condemned during the occupancy. The condemnor has the right to possession when the persons who occupied the acquired property vacate, or hold over beyond the vacation date established by the condemnor, whichever is sooner, except as provided under par. (c). If the condemnor is denied the right of possession, the condemnor may, upon 48 hours' notice to the occupant, apply to the circuit court where the property is located for a writ of assistance to be put in possession. *The circuit court shall grant the writ of assistance if all jurisdictional requirements have been complied with, if the award has been paid or tendered as required and if the condemnor has made a comparable replacement property available to the occupants, except as provided under par. (c).*

(c) *The condemnor may not require the persons who occupied the premises on the date that title vested in the condemnor to vacate until a comparable replacement property is made available.* This paragraph does not apply to any person who waives his or her right to receive relocation benefits or services under s. 32.197 or who is not a displaced person, as defined under s. 32.19(2)(e), unless the acquired property is part of a program or project receiving federal financial assistance.

(Emphasis added.)

¶ 12 WISCONSIN STAT. § 32.19, entitled "Additional items payable," provides for payments to persons displaced by public projects and includes payments to both owners and tenants and to businesses, farm operations, and individuals in dwellings, all as defined in this section. The declaration of purpose in § 32.19(1) provides as follows:

(1) DECLARATION OF PURPOSE. The legislature declares that it is in the public interest that persons displaced by any public project be fairly compensated by payment for the property acquired and other losses hereinafter described and suffered as the result of programs designed for the benefit of the public as a whole; and the legislature further finds and declares that, notwithstanding subch. II, or any other provision of law, payment of such relocation assistance and assistance in the acquisition of replacement housing are proper costs of the construction of public improvements. . . .

¶ 13 A "comparable replacement business" is defined in WIS. STAT. § 32.19(2)(c) as:

[A] replacement business which, when compared with the business premises being acquired by the condemnor, is adequate for the needs of the business, is reasonably similar in all major characteristics, is functionally equivalent with respect to condition, state of repair, land area, building square footage required, access to transportation, utilities and public service, is available on the market, meets all applicable federal, state or local codes required of the particular business being conducted, is within reasonable proximity of the business acquired and is suited for the same type of business conducted by the acquired business at the time of acquisition.

¶ 14 WISCONSIN STAT. § 32.19(3)(a) provides for payment of certain actual moving expenses as well as actual reasonable expenses necessary to reestablish a business not to exceed $10,000, with an exception; under para. (b) a displaced business may elect instead to receive a fixed payment established by regulation, which is capped at $20,000. Paragraph (c) provides for an additional payment for persons who moved their businesses, elected payments under para. (a), and within two years of the receipt of that payment discontinued their business, up to a combined maximum of $20,000.

¶ 15 WISCONSIN STAT. § 32.19(4m)(b) addresses payments to business owners who rent and are displaced if such an owner either rents or purchases a comparable replacement business within two years after vacating the acquired property. The condemnor must pay the owner of the displaced business based on a formula that compares the monthly rent paid for the acquired property to the monthly rent of a comparable replacement business in an amount not to exceed $30,000.

¶ 16 Focusing first on the language of WIS. STAT. § 32.05(8)(c), that section plainly prohibits a condemnor from requiring the occupant of the premises to vacate "until a comparable replacement property is made available," with certain exceptions not applicable here. Subsection (8)(b) repeats that same obligation in the context of the issuance of a writ of assistance: having "made a comparable replacement property available to the occupants . . . " (with the exceptions provided for in para. (c)) is one of the conditions for the issuance of the writ. While there is no definition of "comparable replacement property" in § 32.05, WIS. STAT. § 32.19(2)(b), (c), and (d) define "comparable dwelling," "comparable replacement business," and "comparable replacement farm operation," each of these definitions corresponding to the categories of displaced persons defined in paras. (e) and (h) of § 32.19(2). Neither party here has suggested that "comparable replacement property" in § 32.05(8)(b) and (c) has any meaning other than that defined in § 32.19(2)(b)-(d). We conclude that "comparable replacement property" in § 32.05(8)(b) and (c) plainly refers to those three categories of replacement properties as defined in § 32.19(2)(b)-(d). The applicable definition in this case is that of a "comparable replacement business" in § 32.19(2)(c), as the City has implicitly conceded in its arguments.

¶ 17 We conclude there is nothing in the language of WIS. STAT. § 32.19(3) or (4m), or any other subsection of WIS. STAT. § § 32.05 or 32.19, that supports the City's position that it need not make available a comparable replacement property meeting the definitions of § 32.19(2)(b)-(d), but instead need only identify property that could be made comparable and offer the payments required by § 32.19(3) and (4m).

¶ 18 The moving expenses described in WIS. STAT. § 32.19(3)(a) plainly are expenses that would be incurred in relocating to a comparable replacement

657

property and cannot reasonably be read as limiting the condemnor's obligation to make a comparable replacement property available. The payments under subsec. (4m)(b) are explicitly based on a comparison of rent for the acquired property to rent for a comparable replacement business and thus cannot reasonably be read as a limitation on the obligation to make available a comparable replacement property. The evident purpose of subsec. (4m)(b) is to provide some compensation to a displaced business owner where the rent for a comparable replacement business is higher than that previously paid; no language in the statute suggests that this compensation affects the condemnor's obligation to make available a comparable replacement business property.

¶ 19 Similarly, the City's argument that the payment in WIS. STAT. § 32.19(3)(c) is intended to fulfill the condemnor's obligation when there is no comparable replacement property has no basis in the statutory language. The comparable replacement property must be made available before the occupant can be required to vacate the acquired property, WIS. STAT. § 32.05(8)(c), whereas the payment under § 32.19(3)(c) is available only after the occupant has vacated. The payment in this paragraph is available when a business owner moves the business, obtains payment for moving expenses, and then within two years of that payment decides to discontinue the business at the new location.

. . . .

¶ 26 Unlike the owner in *Dotty Dumpling's*, CC Midwest is not arguing that "make available" in WIS. STAT. § 32.05(8) means "pay for," which was the essence of the owner's argument in *Dotty Dumpling's*. Rather, CC Midwest's position is that "making available" a comparable replacement property under § 32.05(8)(b) and (c) means identifying a property that meets the applicable definition in WIS. STAT. § 32.19(b)-(d).

. . . .

¶ 28 We are persuaded that the issue presented on this appeal is not resolved by **Bassinger** or **Dotty Dumpling's**. A requirement that a condemnor identify a comparable replacement property meeting the applicable definition in WIS. STAT. § 32.19(2)(b)-(d) before making an occupant vacate does not impose an "open-ended" financial obligation on the condemnor and does not render the provisions for payments in § 32.19 meaningless. It is not inconsistent for the legislature to provide that an occupant may not be required to vacate unless the condemnor has identified a comparable replacement property meeting the statutory definition, even though the condemnor's financial obligations to assist the occupant are limited by the provisions for payments in § 32.19.

. . . .

¶ 30 We acknowledge that construing WIS. STAT. § 32.05(8)(b) and (c) to require that the condemnor identify a comparable replacement property meeting the applicable definition in WIS. STAT. § 32.19(2)(b)-(d) may impose significant impediments to public projects in cases where no such property exists. However, we do not agree our construction will lead to absurd results. While there are important public policies that favor facilitating the condemnation of property and removal of occupants when the property is necessary for projects that benefit the public, there are also important public policies that favor ensuring that displaced occupants have a comparable property to move to. It is for the legislature to decide the proper balance, within the parameters of constitutional requirements, between these policies when there is a conflict. The legislature could reasonably decide that a condemnor should not be able to remove an occupant if there is no comparable replacement property for it to move to, even if this means modifying, or even not going ahead with, a desirable public project.

¶ 31 We are satisfied that the legislature has expressed this intent in the plain language of WIS. STAT. § 32.05(8)(b) and (c) and WIS. STAT. § 32.19(2)(b)-(d). The legislature could have stated that the condemnor could require an occupant to vacate if no comparable replacement property existed; it could have defined comparable replacement property in less restrictive ways; it could have provided that if the condemnor offers all the payments to which an occupant is entitled under § 32.19, it has satisfied the obligation to make available a comparable replacement property before requiring the occupant to vacate. However, the legislature has done none of these things. Instead it has chosen to plainly state that a condemnor may not require an occupant to vacate "until a comparable replacement property is made available," § 32.05(8)(c), and it has chosen to very specifically define three categories of comparable replacement properties in § 32.19(2)(b)-(d).

*CC Midwest,* 289 Wis. 2d 453, ¶¶ 11–19, 26, 28, 30, 31.

## ADDITIONAL COMMENT

¶ 93. The City argues that this plain reading analysis is radical and cannot be supported by the legislative history. I disagree.

¶ 94. Courts have often said that the rule against consequential or incidental damages should be addressed by Congress or by state legislatures. The advice from Justice Douglas on this point is quoted in *Luber,* 47 Wis. 2d at 277 (quoting *United States v. General Motors Corp.,* 323 U.S. 373, 385 (1945) (Douglas, J., concurring)). Both Congress and the Wisconsin Legislature have acted on this advice, and in the process they have made a valiant effort to head off costly litigation on the scope of just compensation.

¶ 95. In 1970 Congress passed the Uniform Relocation Assistance and Real Property Acquisition Policies Act, P.L. 91–646, 84 Stat. 1894; 42 U.S.C. §§ 4621–4638. This legislation provided in part that the head of a federal agency could not approve any grant to a state agency for any program "which will result in the displacement of any person" *unless* the agency head had received satisfactory assurance that *fair and reasonable relocation payments and assistance* would be provided to or for the displaced person. The Wisconsin Legislature rushed to comply with this federal law and, in most respects, it strengthened existing relocation benefits. *See* Ch. 103, Laws of 1971; 61 Op. Att'y Gen. 49 (1972); 61 Op. Att'y Gen. 197 (1972). In 1974 the National Conference of Commissioners on Uniform State Laws also promulgated a Uniform Eminent Domain Code that included liberalized provisions on just compensation and relocation benefits.

¶ 96. Wisconsin had begun statutory modification of the business losses rule in 1959. *See* § 1, ch. 639, Laws of 1959. Section 32.19 was created in 1961. *See* § 18, ch. 486, Laws of 1961. Thus the subject of additional compensation and assistance was not new to the legislature. But the federal act as well as the *Luber* decision generated substantial additional legislative activity.

¶ 97. At the beginning of the 1981 legislative session, the declaration of purpose for relocation benefits in Wis. Stat. § 32.19(1)[10] and the definitions of "comparable dwelling," "comparable replacement busi-

---

[10] This was cited in ¶ 12 of the court of appeals decision. *See* ¶ 92 above.

ness," and "comparable replacement farm operation" were already in place. Wis. Stat. § 32.19(1), (2)(f), (g), and (h) (1979–80). But Wis. Stat. § 32.05(8) was much different from what it is today, because it made *no* reference to "comparable replacement property." It read:

> (8) Occupancy; Writ of Assistance; Waste. The condemnor shall allow any person occupying the property on the date that title vests in the condemnor to continue to occupy the property for at least one month after that date. The condemnor may not charge rent for any property occupied after the date that title vests in the condemnor by a person who occupied the property on that date. Any person occupying the property after the date that title vests in the condemnor shall be liable to the condemnor for all waste committed or allowed by the occupant on the lands condemned during the occupancy. The condemnor shall have the right to possession when the persons who occupied the property on the date that title vests in the condemnor vacate, or one month after the date that title vests in the condemnor, whichever is sooner. This time period may be extended by the circuit court, if the court deems it reasonable under the circumstances. If the condemnor is denied the right of possession, the condemnor may, upon 48 hours' notice to the occupant, apply to the circuit court where the property is located for a writ of assistance to be put in possession. The circuit court shall grant the writ of assistance if all jurisdictional requirements have been complied with and if the award has been paid or tendered as required.

Wis. Stat. § 32.05(8) (1979–80).

¶ 98. During the 1981 session, the Department of Industry, Labor and Human Relations (DILHR) asked Senator Jerome Van Sistine to introduce legislation

amending Wis. Stat. § 32.05(8) and several other provisions in Chapter 32. *See* 1981 S.B. 562. The bill analysis read in part:

> (1) Current law is unclear and contradictory in regard to the conditions and terms of continued occupancy by displaced persons during the period after acquisition but before displacement. *This bill provides that no person may be required to move without at least 90 days' written notice from the condemnor and until a comparable replacement property is made available.*
>
> (2) Current law provides that if a comparable dwelling is not available within the statutory monetary limits, the condemnor may exceed the limits and make payments necessary to provide a comparable replacement dwelling. This bill requires the condemnor to exceed the monetary limits under these circumstances. (Emphasis added.)

¶ 99. Senator Van Sistine's bill did not pass, but Governor Anthony Earl submitted DILHR's "comparable replacement property" language in his first biennial budget, and it was approved without change. *See* 1983 Wis. Act 27, § 877; *see also* 1983 Wis. Act 27, § 878.

¶ 100. In short, the requirement to make a "comparable replacement property" available was submitted to the legislature by the executive branch, first under Governor Lee Dreyfus, then under Governor Anthony Earl. The language emanated from and was approved by DILHR which was charged with the responsibility of administering a major portion of the relocation provisions in the law. Presumably, after years of working with state and federal laws on relocation, state regulators knew what they were doing.

¶ 101. The DILHR package of proposals did not *require* a condemnor to exceed statutory payment limits for a "comparable replacement business" as it did for a

"comparable dwelling." But the continuing caps on relocation payments for businesses and farm operations are mitigated somewhat by forcing the condemnor to strictly comply with the law.[11] Strict compliance requires a condemnor to identify a "comparable replacement property" that exists. Strict compliance may nudge the parties to negotiate time to turn a *potential* "comparable replacement property" into an *available* "comparable replacement property"—*current availability being a condition precedent to issuance of a writ.* This is precisely what the statute requires.

¶ 102. The City argues that the court of appeals' plain reading analysis is unreasonable because it may prevent the condemnor from ever removing the condemnee. Again, I disagree.

¶ 103. A party seeking a writ of assistance is required to make available a "comparable replacement

[11] "Because the power of eminent domain under WIS. STAT. ch. 32 is extraordinary, we strictly construe the condemnor's power under WIS. STAT. § 32.05, while liberally construing provisions favoring the landowner, including available remedies and compensation." *TFJ Nominee Trust v. DOT,* 2001 WI App 116, ¶ 10, 244 Wis. 2d 242, 629 N.W.2d 57 (citing *Miesen v. DOT,* 226 Wis. 2d 298, 304, 594 N.W.2d 821 (Ct. App. 1999)); *see also Shepherd Legan Aldrian Ltd. v. Vill. of Shorewood,* 182 Wis. 2d 472, 478, 513 N.W.2d 686 (Ct. App. 1994). This formulation can be traced back to *Aero Auto Parts, Inc. v. Department of Transportation,* 78 Wis. 2d 235, 241, 253 N.W.2d 896 (1977), in which the court quoted 1 Nichols, *Eminent Domain* § 3.213[4] (rev. 3d ed. 1976):

> The rule of strict construction applies to the power of the condemnor and to the exercise of such power. It is a rule intended for the benefit of the owner who is deprived of property against his will. It follows, therefore, that the converse of this rule is also true. Statutory provisions in favor of an owner, such as provisions regulating the remedies of such owner and the compensation to be paid to him, are to be liberally construed.

property." Wis. Stat. § 32.05(8). Whether a nominated property is a "comparable replacement property" is a question to be resolved by the circuit court. If the condemnor prevails in court, it obtains a writ and forces the condemnee's removal.[12] Hence, compliance with the requirement greatly benefits the condemnor. If the condemnor does not prevail, it will look anew for "comparable replacement property"—with more precise information on what is required—or it will negotiate an agreement with the condemnee.

¶ 104. A municipality should make a realistic assessment of whether a "comparable replacement property" is available early on and develop an appropriate strategy. A "comparable replacement property" may not always be available. If the municipality is able to purchase the underlying property instead of condemning it, the municipality ought to be able to assume the original owner's rights under a lease. Thereafter, it may

---

[12] Wisconsin's business replacement payments, which were once considered a substantial right and a breakthrough in the law of eminent domain, have been eroded by time. Since 1977 and 1979 when the legislature provided for maximum business replacement payments of $50,000 for business owners and $30,000 for business tenants respectively, the legislature has never increased these maximums. We understand that $50,000 from 1977 and $30,000 from 1979 are not worth the same in today's world. According to the United States Department of Labor, what was worth $50,000. in 1977 is now worth $171,575.08, and what was worth $30,000 in 1979 is now worth $85,929.34. U.S. Dep't of Labor, Bureau of Labor Statistics, http://www.bls.gov/bls/inflation.htm (last visited June 26, 2007).

Should the legislature want to minimize the disruption to business owners and tenants, it should increase the statutory maximums for business replacement payments in Wis. Stat. § 32.19(4m).

seek to evict tenants under normal landlord-tenant law. *See* Wis. Stat. §§ 704.17, 704.19. If the municipality is required to condemn the property instead of purchasing it, it may be necessary to condemn the entirety of any business that would have occupancy rights on the property under Wis. Stat. § 32.05(8) and pay accordingly. The cost would be borne by the public, which presumably benefits from the taking.

¶ 105. If the law is not interpreted in a way that requires the availability of a "comparable replacement property" tied to the definitions in Wis. Stat. § 32.19(2), it is likely to destroy existing businesses or leave individuals without a home.

¶ 106. The majority is simply not prepared to apply clear statutory language. Its injection of ambiguous "parameters" into the statutory scheme may help the condemnor but does absolutely nothing to help the condemnee. Its apparent reliance on potential comparable replacement properties is a direct contradiction of the statutory language.

¶ 107. For the reasons stated, I respectfully dissent.

¶ 108. LOUIS B. BUTLER, JR., J. (*dissenting*). I agree with and adopt, for purposes of this opinion, Justice Wilcox's concurring opinion,[1] and its discussion of "comparable replacement business" pursuant to Wis. Stat. § 39.19(2)(c). There is no need to repeat that analysis here. Applying his analysis of the statute to the facts of this case, I strongly disagree with his conclusion

---

[1] That is, all but ¶ 60 of Justice Wilcox's concurring opinion. In my view, the proper application of Justice Wilcox's analysis necessitates a dissent under these facts.

that the property at 1700 East Delavan Drive in Janesville constituted a "comparable replacement business."[2] Accordingly, I dissent.

¶ 109. The affidavit of Michael Ryan, the terminal manager for CC Midwest, stressed the need for a cross-docking[3] arrangement for the loading and unloading of trucks. The affidavit pointed out that the loading and unloading of freight is accomplished with forklifts, and that by far the most time efficient way to load and unload is with a cross-dock operation. This arrangement allowed CC Midwest to minimize "traffic jams" between forklifts.

¶ 110. Without a cross-dock operation, according to Ryan, forklifts must loop out of the back of one truck and into the back of another. This type of operation causes interference between forklift operators and results in not only a loss of time and efficiency, but presents a safety hazard as well. This is because freight is stacked on pallets up to seven feet high and eight and one-half feet wide. Thus, the operator has virtually no visibility to the front.

¶ 111. Ryan made it clear that cross-dock capabilities were essential to their less-than-truckload (LTL) process, and that any property that was to meet CC Midwest's needs must have this process, as their then-existing terminal did. A total of twenty docks were needed, the same number CC Midwest then had in place.

---

[2] I agree with Justice Wilcox that none of the other properties constitute a "comparable replacement business." Justice Wilcox's concurrence, ¶¶ 61–62.

[3] Cross-docking is a practice in logistics of unloading materials from an incoming semi-trailer truck and loading these materials in outbound trailers, with little or no storage in between.

¶ 112. The 1700 East Delavan Property does not qualify as a "comparable replacement business" under Wis. Stat. § 32.19(2)(c). Without cross-docking capabilities, the property was not adequate for the needs of the business, was not reasonably similar in all major characteristics, was not functionally equivalent with respect to its condition, and was not suited for the same type of business conducted by the acquired business at the time of the acquisition. *See* Wis. Stat. § 32.19(2)(c). *Compare* Justice Wilcox's concurrence, ¶ 56.

¶ 113. The majority opinion dismisses CC Midwest's cross-docking needs, indicating that CC Midwest offered no reason why cross-docks could not be constructed. Majority op., ¶ 45. Taking that logic to its ultimate conclusion, a vacant lot would be adequate under the lead opinion's rationale.

¶ 114. Wisconsin Stat. § 32.05(8)(c) provides that the condemnor may not require the persons who occupy the premises on the date that title vests in the condemnor to vacate "until a comparable replacement property" is made available. Given that the City failed to provide a property that satisfied the criteria of a "comparable replacement business," it failed to make a "comparable replacement property" available. Accordingly, the City should not have been granted a writ of assistance pursuant to § 32.05(8)(c). CC Midwest should not have been forced to vacate the premises.

¶ 115. For the foregoing reasons, I respectfully dissent.